# SMITH *v.* UNITED STATES

No. 91–8674.   Argued March 23, 1993—Decided June 1, 1993

*Gary Kollin,* by appointment of the Court, 506 U. S. 938, argued the cause and filed a brief for petitioner.

*Thomas G. Hungar* argued the cause for the United States. With him on the brief were *Solicitor General Starr, Assistant Attorney General Mueller, Deputy Solicitor General Bryson,* and *John F. DePue.*

JUSTICE O'CONNOR delivered the opinion of the Court.

We decide today whether the exchange of a gun for narcotics constitutes "use" of a firearm "during and in relation to . . . [a] drug trafficking crime" within the meaning of 18 U. S. C. § 924(c)(1). We hold that it does.

## I

Petitioner John Angus Smith and his companion went from Tennessee to Florida to buy cocaine; they hoped to resell it at a profit. While in Florida, they met petitioner's acquaintance, Deborah Hoag. Hoag agreed to, and in fact did, purchase cocaine for petitioner. She then accompanied petitioner and his friend to her motel room, where they were joined by a drug dealer. While Hoag listened, petitioner and the dealer discussed petitioner's MAC–10 firearm, which had been modified to operate as an automatic. The MAC–10 apparently is a favorite among criminals. It is small and compact, lightweight, and can be equipped with a silencer. Most important of all, it can be devastating: A fully automatic MAC–10 can fire more than 1,000 rounds per minute. The dealer expressed his interest in becoming the owner of a MAC–10, and petitioner promised that he would discuss selling the gun if his arrangement with another potential buyer fell through.

Unfortunately for petitioner, Hoag had contacts not only with narcotics traffickers but also with law enforcement officials. In fact, she was a confidential informant. Consistent with her post, she informed the Broward County Sheriff's Office of petitioner's activities. The Sheriff's Office responded quickly, sending an undercover officer to Hoag's motel room. Several others were assigned to keep the motel under surveillance. Upon arriving at Hoag's motel room, the undercover officer presented himself to petitioner as a pawnshop dealer. Petitioner, in turn, presented the officer with a proposition: He had an automatic MAC–10 and silencer with which he might be willing to part. Petitioner

then pulled the MAC–10 out of a black canvas bag and showed it to the officer. The officer examined the gun and asked petitioner what he wanted for it. Rather than asking for money, however, petitioner asked for drugs. He was willing to trade his MAC–10, he said, for two ounces of cocaine. The officer told petitioner that he was just a pawnshop dealer and did not distribute narcotics. Nonetheless, he indicated that he wanted the MAC–10 and would try to get the cocaine. The officer then left, promising to return within an hour.

Rather than seeking out cocaine as he had promised, the officer returned to the Sheriff's Office to arrange for petitioner's arrest. But petitioner was not content to wait. The officers who were conducting surveillance saw him leave the motel room carrying a gun bag; he then climbed into his van and drove away. The officers reported petitioner's departure and began following him. When law enforcement authorities tried to stop petitioner, he led them on a high-speed chase. Petitioner eventually was apprehended.

Petitioner, it turns out, was well armed. A search of his van revealed the MAC–10 weapon, a silencer, ammunition, and a "fast-feed" mechanism. In addition, the police found a MAC–11 machine gun, a loaded .45 caliber pistol, and a .22 caliber pistol with a scope and homemade silencer. Petitioner also had a loaded 9 millimeter handgun in his waistband.

A grand jury sitting in the District Court for the Southern District of Florida returned an indictment charging petitioner with, among other offenses, two drug trafficking crimes—conspiracy to possess cocaine with intent to distribute and attempt to possess cocaine with intent to distribute in violation of 21 U. S. C. §§ 841(a)(1), 846, and 18 U. S. C. § 2. App. 3–9. Most important here, the indictment alleged that petitioner knowingly used the MAC–10 and its silencer during and in relation to a drug trafficking crime. *Id.*, at 4–5. Under 18 U. S. C. § 924(c)(1), a defendant who so uses a fire-

arm must be sentenced to five years' incarceration. And where, as here, the firearm is a "machinegun" or is fitted with a silencer, the sentence is 30 years. See § 924(c)(1) ("[I]f the firearm is a machinegun, or is equipped with a firearm silencer," the sentence is "thirty years"); § 921(a)(23), 26 U. S. C. § 5845(b) (term "machinegun" includes automatic weapons). The jury convicted petitioner on all counts.

On appeal, petitioner argued that § 924(c)(1)'s penalty for using a firearm during and in relation to a drug trafficking offense covers only situations in which the firearm is used as a weapon. According to petitioner, the provision does not extend to defendants who use a firearm solely as a medium of exchange or for barter. The Court of Appeals for the Eleventh Circuit disagreed. 957 F. 2d 835 (1992). The plain language of the statute, the court explained, imposes no requirement that the firearm be used as a weapon. Instead, any use of "the weapon to facilitate *in any manner* the commission of the offense" suffices. *Id.,* at 837 (internal quotation marks omitted).

Shortly before the Eleventh Circuit decided this case, the Court of Appeals for the District of Columbia Circuit arrived at the same conclusion. *United States* v. *Harris,* 294 U. S. App. D. C. 300, 315–316, 959 F. 2d 246, 261–262 *(per curiam),* cert. denied, 506 U. S. 932 (1992). In *United States* v. *Phelps,* 877 F. 2d 28 (1989), however, the Court of Appeals for the Ninth Circuit held that trading a gun in a drug-related transaction could not constitute use of a firearm during and in relation to a drug trafficking offense within the meaning of § 924(c)(1). We granted certiorari to resolve the conflict among the Circuits. 506 U. S. 814 (1992). We now affirm.

## II

Section 924(c)(1) requires the imposition of specified penalties if the defendant, "during and in relation to any crime of violence or drug trafficking crime[,] uses or carries a firearm." By its terms, the statute requires the prosecution to

make two showings. First, the prosecution must demonstrate that the defendant "use[d] or carrie[d] a firearm." Second, it must prove that the use or carrying was "during and in relation to" a "crime of violence or drug trafficking crime."

## A

Petitioner argues that exchanging a firearm for drugs does not constitute "use" of the firearm within the meaning of the statute. He points out that nothing in the record indicates that he fired the MAC–10, threatened anyone with it, or employed it for self-protection. In essence, petitioner argues that he cannot be said to have "use[d]" a firearm unless he used it as a weapon, since that is how firearms most often are used. See 957 F. 2d, at 837 (firearm often facilitates drug offenses by protecting drugs or protecting or emboldening the defendant). Of course, § 924(c)(1) is not limited to those cases in which a gun is used; it applies with equal force whenever a gun is "carrie[d]." In this case, however, the indictment alleged only that petitioner "use[d]" the MAC–10. App. 4. Accordingly, we do not consider whether the evidence might support the conclusion that petitioner carried the MAC–10 within the meaning of § 924(c)(1). Instead we confine our discussion to what the parties view as the dispositive issue in this case: whether trading a firearm for drugs can constitute "use" of the firearm within the meaning of § 924(c)(1).

When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning. See *Perrin* v. *United States,* 444 U. S. 37, 42 (1979) (words not defined in statute should be given ordinary or common meaning). Accord, *post,* at 242 ("In the search for statutory meaning, we give nontechnical words and phrases their ordinary meaning"). Surely petitioner's treatment of his MAC–10 can be described as "use" within the everyday meaning of that term. Petitioner "used" his MAC–10 in an attempt to obtain drugs by offering to trade it for cocaine. Webster's

defines "to use" as "[t]o convert to one's service" or "to employ." Webster's New International Dictionary 2806 (2d ed. 1950). Black's Law Dictionary contains a similar definition: "[t]o make use of; to convert to one's service; to employ; to avail oneself of; to utilize; to carry out a purpose or action by means of." Black's Law Dictionary 1541 (6th ed. 1990). Indeed, over 100 years ago we gave the word "use" the same gloss, indicating that it means "'to employ'" or "'to derive service from.'" *Astor* v. *Merritt,* 111 U. S. 202, 213 (1884). Petitioner's handling of the MAC-10 in this case falls squarely within those definitions. By attempting to trade his MAC-10 for the drugs, he "used" or "employed" it as an item of barter to obtain cocaine; he "derived service" from it because it was going to bring him the very drugs he sought.

In petitioner's view, § 924(c)(1) should require proof not only that the defendant used the firearm, but also that he used it *as a weapon.* But the words "as a weapon" appear nowhere in the statute. Rather, § 924(c)(1)'s language sweeps broadly, punishing any "us[e]" of a firearm, so long as the use is "during and in relation to" a drug trafficking offense. See *United States* v. *Long,* 284 U. S. App. D. C. 405, 409–410, 905 F. 2d 1572, 1576–1577 (Thomas, J.) (although not without limits, the word "use" is "expansive" and extends even to situations where the gun is not actively employed), cert. denied, 498 U. S. 948 (1990). Had Congress intended the narrow construction petitioner urges, it could have so indicated. It did not, and we decline to introduce that additional requirement on our own.

Language, of course, cannot be interpreted apart from context. The meaning of a word that appears ambiguous if viewed in isolation may become clear when the word is analyzed in light of the terms that surround it. Recognizing this, petitioner and the dissent argue that the word "uses" has a somewhat reduced scope in § 924(c)(1) because it appears alongside the word "firearm." Specifically, they contend that the average person on the street would not think

immediately of a guns-for-drugs trade as an example of "us[ing] a firearm." Rather, that phrase normally evokes an image of the most familiar use to which a firearm is put— use as a weapon. Petitioner and the dissent therefore argue that the statute excludes uses where the weapon is not fired or otherwise employed for its destructive capacity. See *post*, at 242–244. Indeed, relying on that argument—and without citation to authority—the dissent announces its own, restrictive definition of "use." "To use an instrumentality," the dissent argues, "ordinarily means to use it for its intended purpose." *Post*, at 242.

There is a significant flaw to this argument. It is one thing to say that the ordinary meaning of "uses a firearm" *includes* using a firearm as a weapon, since that is the intended purpose of a firearm and the example of "use" that most immediately comes to mind. But it is quite another to conclude that, as a result, the phrase also *excludes* any other use. Certainly that conclusion does not follow from the phrase "uses . . . a firearm" itself. As the dictionary definitions and experience make clear, one can use a firearm in a number of ways. That one example of "use" is the first to come to mind when the phrase "uses . . . a firearm" is uttered does not preclude us from recognizing that there are other "uses" that qualify as well. In this case, it is both reasonable and normal to say that petitioner "used" his MAC–10 in his drug trafficking offense by trading it for cocaine; the dissent does not contend otherwise. *Ibid.*

The dissent's example of how one might "use" a cane, *ibid.*, suffers from a similar flaw. To be sure, "use" as an adornment in a hallway is not the first "use" of a cane that comes to mind. But certainly it does not follow that the *only* "use" to which a cane might be put is assisting one's grandfather in walking. Quite the opposite: The most infamous use of a cane in American history had nothing to do with walking at all, see J. McPherson, Battle Cry of Freedom 150 (1988) (describing the caning of Senator Sumner in the

United States Senate in 1856); and the use of a cane as an instrument of punishment was once so common that "to cane" has become a verb meaning "[t]o beat with a cane." Webster's New International Dictionary, *supra*, at 390. In any event, the only question in this case is whether the phrase "uses . . . a firearm" in §924(c)(1) is most reasonably read as *excluding* the use of a firearm in a gun-for-drugs trade. The fact that the phrase clearly *includes* using a firearm to shoot someone, as the dissent contends, does not answer it.

The dissent relies on one authority, the United States Sentencing Commission, Guidelines Manual (Nov. 1992), as "reflect[ing]" its interpretation of the phrase "uses . . . a firearm." See *post*, at 243. But the Guidelines do not define "using a firearm" as using it for its intended purposes, which the dissent apparently assumes are limited to firing, brandishing, displaying, and possessing. In fact, if we entertain for the moment the dubious assumption that the Sentencing Guidelines are relevant in the present context, they support the opposite view. Section 2B3.1(b)(2), upon which the dissent relies, *ibid.*, provides for increases in a defendant's offense level, and therefore his sentence, if the offense involved a firearm. The extent of the adjustment varies according to the nature of the gun's involvement. There is a seven-point upward adjustment if the firearm "was discharged," §2B3.1(b)(2)(A); a six-point enhancement if a gun was "otherwise *used*," §2B3.1(b)(2)(B) (emphasis added); and a five-point adjustment if the firearm was brandished, displayed, or possessed, §2B3.1(b)(2)(C). Unless the six-point enhancement for "othe[r] use[s]" is mere surplusage, there must be "uses" for a firearm *other than* its "intended purposes" of firing, brandishing, displaying, or possessing. The dissent points out that there may be *some* uses that are not firing or brandishing but constitute use as a weapon nonetheless. See *post*, at 243–244, n. 2. But nothing in §2B3.1(b)(2)(B) suggests that the phrase "othe[r] use[s]"

must be so limited. On the contrary, it is perfectly reasonable to construe § 2B3.1(b)(2)(B) as including uses, such as trading and bludgeoning, that do not constitute use for the firearm's "intended purpose."

It is true that the Guidelines commentary defines " '[o]therwise used' " as conduct that falls short of " 'discharg[ing] a firearm but [is] more than brandishing, displaying, or possessing [it].' " *Post,* at 243 (quoting USSG § 1B1.1, comment., n. 1(g)). That definition, however, simply reflects the peculiar hierarchy of culpability established in USSG § 2B3.1(b)(2). It clarifies that between the most culpable conduct of discharging the firearm and less culpable actions such as "brandishing, displaying, or possessing" lies a category of "othe[r] use[s]" for which the Guidelines impose intermediate punishment. It does not by its terms exclude from its scope trading, bludgeoning, or any other use beyond the firearm's "intended purpose."

We are not persuaded that our construction of the phrase "uses . . . a firearm" will produce anomalous applications. See *post,* at 242 (example of using a gun to scratch one's head). As we already have noted, see *supra,* at 227–228, and will explain in greater detail later, *infra,* at 237–239, § 924(c)(1) requires not only that the defendant "use" the firearm, but also that he use it "during and in relation to" the drug trafficking crime. As a result, the defendant who "uses" a firearm to scratch his head, see *post,* at 242, or for some other innocuous purpose, would avoid punishment for that conduct altogether: Although scratching one's head with a gun might constitute "use," that action cannot support punishment under § 924(c)(1) unless it facilitates or furthers the drug crime; that the firearm served to relieve an itch is not enough. See *infra,* at 238 (phrase "in relation to" requires, at a minimum, that the use facilitate the crime). Such a defendant would escape the six-point enhancement provided in USSG § 2B3.1(b)(2)(B) as well. As the Guidelines definition of "[o]therwise use[d]" makes clear, see USSG § 1B1.1,

comment., n. 1(g), the six-point enhancement does not apply unless the use is "more than" brandishing. While pistol-whipping a victim with a firearm might be "more than" brandishing, scratching one's head is not.

In any event, the "intended purpose" of a firearm is not that it be used in any offensive manner whatever, but rather that it be used in a particular fashion—by firing it. The dissent's contention therefore cannot be that the defendant must use the firearm "as a weapon," but rather that he must fire it or threaten to fire it, "as a gun." Under the dissent's approach, then, even the criminal who pistol-whips his victim has not used a firearm within the meaning of § 924(c)(1), for firearms are intended to be fired or brandished, not used as bludgeons. It appears that the dissent similarly would limit the scope of the "othe[r] use[s]" covered by USSG § 2B3.1(b) (2)(B). The universal view of the courts of appeals, however, is directly to the contrary. No court of appeals ever has held that using a gun to pistol-whip a victim is anything but the "use" of a firearm; nor has any court ever held that trading a firearm for drugs falls short of being the "use" thereof. But cf. *Phelps*, 877 F. 2d, at 30 (holding that trading a gun for drugs is not use *"in relation to"* a drug trafficking offense).

To the extent there is uncertainty about the scope of the phrase "uses . . . a firearm" in § 924(c)(1), we believe the remainder of § 924 appropriately sets it to rest. Just as a single word cannot be read in isolation, nor can a single provision of a statute. As we have recognized:

> "Statutory construction . . . is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme— because the same terminology is used elsewhere in a context that makes its meaning clear, or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *United Savings Assn. of Texas* v. *Timbers of Inwood*

*Forest Associates, Ltd.*, 484 U. S. 365, 371 (1988) (citations omitted).

Here, Congress employed the words "use" and "firearm" together not only in § 924(c)(1), but also in § 924(d)(1), which deals with forfeiture of firearms. See *United States* v. *One Assortment of 89 Firearms*, 465 U. S. 354 (1984) (discussing earlier version of the statute). Under § 924(d)(1), any "firearm or ammunition intended to be used" in the various offenses listed in § 924(d)(3) is subject to seizure and forfeiture. Consistent with petitioner's interpretation, § 924(d)(3) lists offenses in which guns might be used as offensive weapons. See §§ 924(d)(3)(A), (B) (weapons used in a crime of violence or drug trafficking offense). But it also lists offenses in which the firearm is *not* used as a weapon but instead as an item of barter or commerce. For example, any gun intended to be "used" in an interstate "transfer, s[ale], trade, gi[ft], transport, or deliver[y]" of a firearm prohibited under § 922(a)(5) where there is a pattern of such activity, see § 924(d)(3)(C), or in a federal offense involving "the exportation of firearms," § 924(d)(3)(F), is subject to forfeiture. In fact, none of the offenses listed in four of the six subsections of § 924(d)(3) involves the bellicose use of a firearm; each offense involves use as an item in commerce.* Thus, it is clear

---

*Section 924(d)(3)(C) lists four offenses: unlicensed manufacture of or commerce in firearms, in violation of § 922(a)(1); unlicensed receipt of a weapon from outside the State, in violation of § 922(a)(3); unlicensed transfer of a firearm to a resident of a different State, in violation of § 922(a)(5); and delivery of a gun by a licensed entity to a resident of a State that is not the licensee's, in violation of § 922(b)(3). Section 924(d)(3)(D) mentions only one offense, the transfer or sale of a weapon to disqualified persons, such as fugitives from justice and felons, in violation of § 922(d). Under § 924(d)(3)(E), firearms are subject to forfeiture if they are intended to be used in any of five listed offenses: shipping stolen firearms, in violation of § 922(i); receipt of stolen firearms, in violation of § 922(j); importation of firearms, in violation of § 922(*l*); shipment of a firearm by a felon, in violation of § 922(n); and shipment or receipt of a firearm with intent to commit a felony, in violation of § 924(b). Finally, § 924(d)(3)(F) subjects to forfeit-

from § 924(d)(3) that one who transports, exports, sells, or trades a firearm "uses" it within the meaning of § 924(d)(1)— even though those actions do not involve using the firearm as a weapon. Unless we are to hold that using a firearm has a different meaning in § 924(c)(1) than it does in § 924(d)— and clearly we should not, *United Savings Assn., supra,* at 371—we must reject petitioner's narrow interpretation.

The evident care with which Congress chose the language of § 924(d)(1) reinforces our conclusion in this regard. Although § 924(d)(1) lists numerous firearm-related offenses that render guns subject to forfeiture, Congress did not lump all of those offenses together and require forfeiture solely of guns "used" in a prohibited activity. Instead, it carefully varied the statutory language in accordance with the guns' relation to the offense. For example, with respect to some crimes, the firearm is subject to forfeiture not only if it is "used," but also if it is "involved in" the offense. § 924(d)(1). Examination of the offenses to which the "involved in" language applies reveals why Congress believed it necessary to include such an expansive term. One of the listed offenses, violation of § 922(a)(6), is the making of a false statement material to the lawfulness of a gun's transfer. Because making a material misstatement in order to acquire or sell a gun is not "use" of the gun even under the broadest definition of the word "use," Congress carefully expanded the statutory language. As a result, a gun with respect to which a material misstatement is made is subject to forfeiture because, even though the gun is not "used" in the offense, it is "involved in" it. Congress, however, did not so expand the language for offenses in which firearms were "intended to be used," even though the firearms in many of those offenses function as items of commerce rather than as weapons. Instead, Congress apparently was of the view that one could use a gun by trading it. In light of the common meaning of

---

ure any firearm intended to be used in any offense that may be prosecuted in federal court if it involves the exportation of firearms.

the word "use" and the structure and language of the statute, we are not in any position to disagree.

The dissent suggests that our interpretation produces a "strange dichotomy" between "using" a firearm and "carrying" one. *Post*, at 246. We do not see why that is so. Just as a defendant may "use" a firearm within the meaning of §924(c)(1) by trading it for drugs *or* using it to shoot someone, so too would a defendant "carry" the firearm by keeping it on his person whether he intends to exchange it for cocaine or fire it in self-defense. The dichotomy arises, if at all, only when one tries to extend the phrase "'uses . . . a firearm'" to any use "'for any purpose whatever.'" *Ibid.* For our purposes, it is sufficient to recognize that, because §924(d)(1) includes both using a firearm for *trade* and using a firearm as a *weapon* as "us[ing] a firearm," it is most reasonable to construe §924(c)(1) as encompassing both of those "uses" as well.

Finally, it is argued that §924(c)(1) originally dealt with use of a firearm during crimes of violence; the provision concerning use of a firearm during and in relation to drug trafficking offenses was added later. *Ibid.* From this, the dissent infers that "use" *originally* was limited to use of a gun "as a weapon." That the statute in its current form employs the term "use" more broadly is unimportant, the dissent contends, because the addition of the words "'drug trafficking crime' would have been a peculiar way to *expand* its meaning." *Ibid.* Even if we assume that Congress had intended the term "use" to have a more limited scope when it passed the original version of §924(c) in 1968, but see *supra*, at 229–231, we believe it clear from the face of the statute that the Congress that amended §924(c) in 1986 did not. Rather, the 1986 Congress employed the term "use" expansively, covering both use as a weapon, as the dissent admits, and use as an item of trade or barter, as an examination of §924(d) demonstrates. Because the phrase "uses . . . a firearm" is broad enough in ordinary usage to cover use of a

firearm as an item of barter or commerce, Congress was free in 1986 so to employ it. The language and structure of § 924 indicate that Congress did just that. Accordingly, we conclude that using a firearm in a guns-for-drugs trade may constitute "us[ing] a firearm" within the meaning of § 924(c)(1).

## B

Using a firearm, however, is not enough to subject the defendant to the punishment required by § 924(c)(1). Instead, the firearm must be used "during and in relation to" a "crime of violence or drug trafficking crime." 18 U. S. C. § 924(c)(1). Petitioner does not deny that the alleged use occurred "during" a drug trafficking crime. Nor could he. The indictment charged that petitioner and his companion conspired to possess cocaine with intent to distribute. App. 3–4. There can be no doubt that the gun-for-drugs trade was proposed during and in furtherance of that interstate drug conspiracy. Nor can it be contended that the alleged use did not occur during the "attempt" to possess cocaine with which petitioner also was charged, *id.*, at 4; the MAC–10 served as an inducement to convince the undercover officer to provide petitioner with the drugs that petitioner sought.

Petitioner, however, does dispute whether his use of the firearm was "in relation to" the drug trafficking offense. The phrase "in relation to" is expansive, cf. *District of Columbia* v. *Greater Washington Board of Trade,* 506 U. S. 125, 129 (1992) (the phrase "relate to" is "deliberately expansive" (internal quotation marks omitted)), as the Courts of Appeals construing § 924(c)(1) have recognized, *United States* v. *Phelps,* 877 F. 2d, at 30 ("[t]he phrase 'in relation to' is broad"); *United States* v. *Harris,* 294 U. S. App. D. C., at 315, 959 F. 2d, at 261 *(per curiam)* (firearm is used "in relation to" the crime if it "facilitate[s] the predicate offense in some way"). Nonetheless, the phrase does illuminate § 924(c)(1)'s boundaries. According to Webster's, "in relation to" means "with reference to" or "as regards." Webster's New Inter-

national Dictionary, at 2102. The phrase "in relation to" thus, at a minimum, clarifies that the firearm must have some purpose or effect with respect to the drug trafficking crime; its presence or involvement cannot be the result of accident or coincidence. As one court has observed, the "in relation to" language "allay[s] explicitly the concern that a person could be" punished under § 924(c)(1) for committing a drug trafficking offense "while in possession of a firearm" even though the firearm's presence is coincidental or entirely "unrelated" to the crime. *United States* v. *Stewart,* 779 F. 2d 538, 539 (CA9 1985) (Kennedy, J.). Instead, the gun at least must "facilitat[e], or ha[ve] the potential of facilitating," the drug trafficking offense. *Id.,* at 540. Accord, *United States* v. *Ocampo,* 890 F. 2d 1363, 1371–1372 (CA7 1989); 957 F. 2d, at 837.

We need not determine the precise contours of the "in relation to" requirement here, however, as petitioner's use of his MAC–10 meets any reasonable construction of it. The MAC–10's presence in this case was not the product of happenstance. On the contrary, "[f]ar more than [in] the ordinary case" under § 924(c)(1), in which the gun merely facilitates the offense by providing a means of protection or intimidation, here "the gun . . . was an integral part of the transaction." *United States* v. *Phelps,* 895 F. 2d 1281, 1283 (CA9 1990) (Kozinski, J., dissenting from denial of rehearing en banc). Without it, the deal would not have been possible. The undercover officer posing as a pawnshop dealer expressly told petitioner that he was not in the narcotics business and that he did not get involved with drugs. For a MAC–10, however, he was willing to see if he could track down some cocaine.

Relying on the decision of the Court of Appeals for the Ninth Circuit in *Phelps* and on the legislative record, petitioner insists that the relationship between the gun and the drug offense in this case is not the type of connection Congress contemplated when it drafted § 924(c)(1). With re-

spect to that argument, we agree with the District of Columbia Circuit's observation:

"It may well be that Congress, when it drafted the language of [§ ]924(c), had in mind a more obvious use of guns in connection with a drug crime, but the language [of the statute] is not so limited[;] nor can we imagine any reason why Congress would not have wished its language to cover this situation. Whether guns are used as the medium of exchange for drugs sold illegally or as a means to protect the transaction or dealers, their introduction into the scene of drug transactions dramatically heightens the danger to society." *Harris, supra,* at 316, 959 F. 2d, at 262.

One need look no further than the pages of the Federal Reporter to verify the truth of that observation. In *Phelps, supra,* the defendant arranged to trade his MAC–10 for chemicals necessary to make methamphetamine. The Ninth Circuit held that the gun was not used or carried "in relation to" the drug trafficking offense because it was used as an item of barter and not as a weapon. The defendant, however, did not believe his MAC–10's capabilities were so limited. When he was stopped for a traffic violation, "[t]he MAC 10, suddenly transmogrified [from an item of commerce] into an offensive weapon, was still in [the defendant's] possession[.] [He] opened fire and shot a deputy sheriff." *Id.,* at 1288, n. 4 (Kozinski, J., dissenting from denial of rehearing en banc).

## C

Finally, the dissent and petitioner invoke the rule of lenity. *Post,* at 246–247. The mere possibility of articulating a narrower construction, however, does not by itself make the rule of lenity applicable. Instead, that venerable rule is reserved for cases where, "[a]fter 'seiz[ing] every thing from which aid can be derived,'" the Court is "left with an ambiguous statute." *United States* v. *Bass,* 404 U. S. 336, 347 (1971) (quot-

ing *United States* v. *Fisher*, 2 Cranch 358, 386 (1805)). Accord, *Moskal* v. *United States*, 498 U. S. 103, 108 (1990). This is not such a case. Not only does petitioner's use of his MAC–10 fall squarely within the common usage and dictionary definitions of the terms "uses . . . a firearm," but Congress affirmatively demonstrated that it meant to include transactions like petitioner's as "us[ing] a firearm" by so employing those terms in § 924(d).

Imposing a more restrictive reading of the phrase "uses . . . a firearm" does violence not only to the structure and language of the statute, but to its purpose as well. When Congress enacted the current version of § 924(c)(1), it was no doubt aware that drugs and guns are a dangerous combination. In 1989, 56 percent of all murders in New York City were drug related; during the same period, the figure for the Nation's Capital was as high as 80 percent. The American Enterprise 100 (Jan.–Feb. 1991). The fact that a gun is treated momentarily as an item of commerce does not render it inert or deprive it of destructive capacity. Rather, as experience demonstrates, it can be converted instantaneously from currency to cannon. See *supra*, at 239. We therefore see no reason why Congress would have intended courts and juries applying § 924(c)(1) to draw a fine metaphysical distinction between a gun's role in a drug offense as a weapon and its role as an item of barter; it creates a grave possibility of violence and death in either capacity.

We have observed that the rule of lenity "cannot dictate an implausible interpretation of a statute, nor one at odds with the generally accepted contemporary meaning of a term." *Taylor* v. *United States*, 495 U. S. 575, 596 (1990). That observation controls this case. Both a firearm's use as a weapon and its use as an item of barter fall within the plain language of § 924(c)(1), so long as the use occurs during and in relation to a drug trafficking offense; both must constitute "uses" of a firearm for § 924(d)(1) to make any sense at all; and both create the very dangers and risks that Congress

meant § 924(c)(1) to address. We therefore hold that a criminal who trades his firearm for drugs "uses" it during and in relation to a drug trafficking offense within the meaning of § 924(c)(1). Because the evidence in this case showed that petitioner "used" his MAC–10 machine gun and silencer in precisely such a manner, proposing to trade them for cocaine, petitioner properly was subjected to § 924(c)(1)'s 30-year mandatory minimum sentence. The judgment of the Court of Appeals, accordingly, is affirmed.

*It is so ordered.*

JUSTICE BLACKMUN, concurring.

I join the Court's opinion in full because I understand the discussion in Part II–B not to foreclose the possibility that the "in relation to" language of 18 U. S. C. § 924(c)(1) requires more than mere furtherance or facilitation of a crime of violence or drug-trafficking crime. I agree with the Court that because petitioner's use of his MAC–10 meets any reasonable construction of the phrase, it is unnecessary to determine in this case the precise contours of "in relation to" as it appears in § 924(c)(1). See *ante,* at 238.

JUSTICE SCALIA, with whom JUSTICE STEVENS and JUSTICE SOUTER join, dissenting.

Section 924(c)(1) mandates a sentence enhancement for any defendant who "during and in relation to any crime of violence or drug trafficking crime . . . uses . . . a firearm." 18 U. S. C. § 924(c)(1). The Court begins its analysis by focusing upon the word "use" in this passage, and explaining that the dictionary definitions of that word are very broad. See *ante,* at 228–229. It is, however, a "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." *Deal* v. *United States, ante,* at 132. That is particularly true of a word as elastic as "use," whose meanings range all the way

from "to partake of" (as in "he uses tobacco") to "to be wont or accustomed" (as in "he used to smoke tobacco"). See Webster's New International Dictionary 2806 (2d ed. 1950).

In the search for statutory meaning, we give nontechnical words and phrases their ordinary meaning. See *Chapman* v. *United States,* 500 U. S. 453, 462 (1991); *Perrin* v. *United States,* 444 U. S. 37, 42 (1979); *Minor* v. *Mechanics Bank of Alexandria,* 1 Pet. 46, 64 (1828). To use an instrumentality ordinarily means to use it for its intended purpose. When someone asks, "Do you use a cane?," he is not inquiring whether you have your grandfather's silver-handled walking stick on display in the hall; he wants to know whether you *walk* with a cane. Similarly, to speak of "using a firearm" is to speak of using it for its distinctive purpose, *i. e.,* as a weapon. To be sure, "one can use a firearm in a number of ways," *ante,* at 230, including as an article of exchange, just as one can "use" a cane as a hall decoration—but that is not the ordinary meaning of "using" the one or the other.[1] The Court does not appear to grasp the distinction between how a word *can be* used and how it *ordinarily is* used. It would, indeed, be "both reasonable and normal to say that petitioner 'used' his MAC–10 in his drug trafficking offense by trading it for cocaine." *Ibid.* It would also be reasonable and normal to say that he "used" it to scratch his head. When one wishes to describe the action of employing the instrument of a firearm for such unusual purposes, "use" is assuredly a

---

[1] The Court asserts that the "significant flaw" in this argument is that "to say that the ordinary meaning of 'uses a firearm' *includes* using a firearm as a weapon" is quite different from saying that the ordinary meaning "also *excludes* any other use." *Ante,* at 230 (emphases in original). The two are indeed different—but it is precisely the latter that I assert to be true: The ordinary meaning of "uses a firearm" does *not* include using it as an article of commerce. I think it perfectly obvious, for example, that the objective falsity requirement for a perjury conviction would not be satisfied if a witness answered "no" to a prosecutor's inquiry whether he had ever "used a firearm," even though he had once sold his grandfather's Enfield rifle to a collector.

verb one could select. But that says nothing about whether the *ordinary* meaning of the phrase "uses a firearm" embraces such extraordinary employments. It is unquestionably *not* reasonable and normal, I think, to say simply "do not use firearms" when one means to prohibit selling or scratching with them.

The normal usage is reflected, for example, in the United States Sentencing Guidelines, which provide for enhanced sentences when firearms are "discharged," "brandished, displayed, or possessed," or "otherwise used." See, *e. g.,* United States Sentencing Commission, Guidelines Manual § 2B3.1(b)(2) (Nov. 1992). As to the latter term, the Guidelines say: "'Otherwise used' with reference to a dangerous weapon (including a firearm) means that the conduct did not amount to the discharge of a firearm but was more than brandishing, displaying, or possessing a firearm or other dangerous weapon." USSG § 1B1.1, comment., n. 1(g) (definitions). "Otherwise used" in this provision obviously means "otherwise used as a weapon."[2]

---

[2] The Court says that it is "not persuaded that [its] construction of the phrase 'uses . . . a firearm' will produce anomalous applications." *Ante,* at 232. But as proof it points only to the fact that § 924(c)(1) fortuitously contains *other language*—the requirement that the use be "during and in relation to any crime of violence or drug trafficking crime"—that happens to prevent untoward results. *Ibid.* That language does not, in fact, prevent all untoward results: Though it excludes an enhanced penalty for the burglar who scratches his head with the barrel of a gun, it requires one for the burglar who happens to use a gun handle, rather than a rock, to break the window affording him entrance—hardly a distinction that ought to make a sentencing difference if the gun has no other connection to the crime. But in any event, an excuse that turns upon the language of § 924(c)(1) is good only for that particular statute. The Court *cannot* avoid "anomalous applications" when it applies its anomalous meaning of "use a firearm" in other contexts—for example, the Guidelines provision just described in text.

In a vain attempt to show the contrary, it asserts that the phrase "otherwise used" in the Guidelines means used for any other purpose at all (the Court's preferred meaning of "use a firearm"), *so long as it is more "culpa-*

Given our rule that ordinary meaning governs, and given the ordinary meaning of "uses a firearm," it seems to me inconsequential that "the words 'as a weapon' appear nowhere in the statute," *ante*, at 229; they are reasonably implicit. Petitioner is not, I think, seeking to introduce an "additional requirement" into the text, *ibid.*, but is simply construing the text according to its normal import.

The Court seeks to avoid this conclusion by referring to the next subsection of the statute, § 924(d), which does not employ the phrase "uses a firearm," but provides for the confiscation of firearms that are "used in" referenced offenses which include the crimes of transferring, selling, or transporting firearms in interstate commerce. The Court concludes from this that *whenever* the term appears in this statute, "use" of a firearm must include nonweapon use. See *ante*, at 233–236. I do not agree. We are dealing here not with a technical word or an "artfully defined" legal term,

---

ble" *than brandishing.* See *ante*, at 232. But whence does it derive that convenient limitation? It appears nowhere in the text—as well it should not, since the whole purpose of the Guidelines is to take out of the hands of individual judges determinations as to what is "more culpable" and "less culpable." The definition of "otherwise used" in the Guidelines merely says that it means "more than" brandishing and less than firing. The Court is confident that "scratching one's head" with a firearm is not "more than" brandishing it. See *ante*, at 233. I certainly agree—but only because the "more" use referred to is more use *as a weapon*. Reading the Guidelines as they are written (rather than importing the Court's *deus ex machina* of a culpability scale), and interpreting "use a firearm" in the strange fashion the Court does, produces, see *ante*, at 232, a full seven-point upward sentence adjustment for firing a gun at a storekeeper during a robbery; a mere five-point adjustment for pointing the gun at the storekeeper (which falls within the Guidelines' definition of "brandished," see USSG § 1B1.1, comment., n. 1(c)); but an intermediate *six*-point adjustment for using the gun to pry open the cash register or prop open the door. Quite obviously ridiculous. When the Guidelines speak of "otherwise us[ing]" a firearm, they mean, in accordance with normal usage, otherwise "using" it as a weapon—for example, placing the gun barrel in the mouth of the storekeeper to intimidate him.

cf. *Dewsnup* v. *Timm*, 502 U. S. 410, 423 (1992) (SCALIA, J., dissenting), but with common words that are, as I have suggested, inordinately sensitive to context. Just as adding the direct object "a firearm" to the verb "use" *narrows* the meaning of that verb (it can no longer mean "partake of"), so also adding the modifier "in the offense of transferring, selling, or transporting firearms" to the phrase "use a firearm" *expands* the meaning of that phrase (it then includes, as it previously would not, nonweapon use). But neither the narrowing nor the expansion should logically be thought to apply to *all* appearances of the affected word or phrase. Just as every appearance of the word "use" in the statute need not be given the narrow meaning that word acquires in the phrase "use a firearm," so also every appearance of the phrase "use a firearm" need not be given the expansive connotation that phrase acquires in the broader context "use a firearm in crimes such as unlawful sale of firearms." When, for example, the statute provides that its prohibition on certain transactions in firearms "shall not apply to the loan or rental of a firearm to any person for temporary use for lawful sporting purposes," 18 U. S. C. §§ 922(a)(5)(B), (b)(3)(B), I have no doubt that the "use" referred to is *only* use as a sporting *weapon,* and not the use of pawning the firearm to pay for a ski trip. Likewise when, in § 924(c)(1), the phrase "uses . . . a firearm" is not employed in a context that necessarily envisions the unusual "use" of a firearm as a commodity, the normally understood meaning of the phrase should prevail.

Another consideration leads to the same conclusion: § 924(c)(1) provides increased penalties not only for one who "uses" a firearm during and in relation to any crime of violence or drug trafficking crime, but also for one who "carries" a firearm in those circumstances. The interpretation I would give the language produces an eminently reasonable dichotomy between "using a firearm" (as a weapon) and "carrying a firearm" (which in the context "uses or carries a fire-

arm" means carrying it in such manner as to be ready for use as a weapon). The Court's interpretation, by contrast, produces a strange dichotomy between "using a firearm for any purpose whatever, including barter," and "carrying a firearm."[3]

Finally, although the present prosecution was brought under the portion of § 924(c)(1) pertaining to use of a firearm "during and in relation to any . . . drug trafficking crime," I think it significant that that portion is affiliated with the pre-existing provision pertaining to use of a firearm "during and in relation to any crime of violence," rather than with the firearm trafficking offenses defined in § 922 and referenced in § 924(d). The word "use" in the "crime of violence" context has the unmistakable import of use as a weapon, and that import carries over, in my view, to the subsequently added phrase "or drug trafficking crime." Surely the word "use" means the same thing as to both, and surely the 1986 addition of "drug trafficking crime" would have been a peculiar way to *expand* its meaning (beyond "use as a weapon") for crimes of violence.

Even if the reader does not consider the issue to be as clear as I do, he must at least acknowledge, I think, that it is eminently debatable—and that is enough, under the rule of lenity, to require finding for the petitioner here. "At the very least, it may be said that the issue is subject to some doubt. Under these circumstances, we adhere to the familiar rule that, 'where there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant.'" *Adamo*

---

[3] The Court responds to this argument by abandoning all pretense of giving the phrase "uses a firearm" even a *permissible* meaning, much less its ordinary one. There is no problem, the Court says, because it is not contending that "uses a firearm" means "uses for *any* purpose," only that it means "uses as a weapon or for trade." See *ante*, at 236. Unfortunately, that is not one of the options that our mother tongue makes available. "Uses a firearm" can be given a broad meaning ("uses for any purpose") or its more ordinary narrow meaning ("uses as a weapon"); but it can not possibly mean "uses as a weapon or for trade."

*Wrecking Co.* v. *United States,* 434 U. S. 275, 284–285 (1978), quoting *United States* v. *Bass,* 404 U. S. 336, 348 (1971).[4]

For the foregoing reasons, I respectfully dissent.

---

[4] The Court contends that giving the language its ordinary meaning would frustrate the purpose of the statute, since a gun "can be converted instantaneously from currency to cannon," *ante,* at 240. Stretching language in order to write a more effective statute than Congress devised is not an exercise we should indulge in. But in any case, the ready ability to use a gun that is at hand as a weapon is perhaps one of the reasons the statute sanctions not only *using* a firearm, but *carrying* one. Here, however, the Government chose not to indict under that provision. See *ante,* at 228.