**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Thomas A. MALCUIT, Defendant–**
**Appellant.**

**No. 95–3794.**

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 12, 1996.

Decided Jan. 21, 1997.

David A. Sierleja (argued and briefed), Office of the U.S. Attorney, Cleveland, OH, for Plaintiff–Appellee.

Debra M. Hughes (argued and briefed), Federal Public Defender's Office, Cleveland, OH, for Defendant–Appellant.

Before: LIVELY, NELSON, and RYAN, Circuit Judges.

LIVELY, Circuit Judge.

The single question for resolution of this appeal is whether the district court correctly determined that the presence of a firearm in the defendant's automobile at the time the defendant committed drug trafficking offenses constituted a violation of 18 U.S.C. § 924(c)(1), which mandates a sentence of five years in addition to the sentence for the underlying offense for anyone who "during and in relation to a crime of violence or drug trafficking crime ... uses or carries a firearm...."

## I.

### A.

On September 12, 1994, Gary Crispin was arrested for marijuana trafficking and agreed to arrange a purchase from his supplier. At that time, Crispin had been acquainted with the defendant, Thomas Malcuit, for approximately one year and had purchased marijuana from him on ten occasions. Beginning on the evening of September 12, Crispin made a series of recorded telephone calls to Malcuit's pager number, and Malcuit returned the calls. Eventually a five-pound sale of marijuana was negotiated, and Crispin and Malcuit agreed to meet in a Burger King parking lot to carry out the transaction. Prior to the arranged meeting time, county narcotics agents and Willoughby, Ohio police officers set up surveillance of the parking lot and prepared to videotape the sale.

At approximately 7:15 p.m. on September 13, 1994, Malcuit arrived in his four-door Honda at the Burger King in Willoughby. As Malcuit was leaving the restaurant, Crispin, wired with a body transmitter, pulled into the parking lot and parked his car with his passenger's side next to the driver's side of Malcuit's Honda. In a conversation overheard by the narcotics agents, Crispin inquired whether Malcuit had brought the marijuana. Malcuit confirmed that he had, returned to the passenger's side of his vehicle, and retrieved a large paper bag, later discovered to contain approximately five pounds of marijuana. He placed the bag in the back seat of Crispin's vehicle and then entered the passenger's side of Crispin's car, where he received $5,200 for a previous transaction. County narcotics agents and Willoughby police officers then approached Crispin's car and arrested Malcuit.

An inventory search of Malcuit's car revealed thirteen pounds of marijuana in a duffel bag in the trunk and bundles of currency totaling $16,000 under the driver's seat

and on the floorboard. The officers also found a green zippered gym bag on the back seat of the driver's side of the vehicle containing, along with some clothing, an unloaded .38 caliber gun and five rounds of ammunition. They also found a lease agreement and key to a storage locker on the floor of the back seat. After obtaining a warrant, officers conducted a search of the storage locker that uncovered more than 100 pounds of marijuana.

A federal grand jury returned a four count indictment against Thomas Malcuit on January 4, 1995, charging him with: distributing approximately five pounds of marijuana on September 13, 1994, in violation of 21 U.S.C. § 841(a)(1); possession with intent to distribute approximately thirteen pounds of marijuana on the same date; using and carrying a Smith & Wesson .38 revolver during and in relation to the aforementioned drug trafficking crimes; and possession with intent to distribute approximately 100 pounds of marijuana on September 14.

### B.

Malcuit entered not guilty pleas at his initial arraignment. He later filed a motion to suppress evidence, which the district court denied following a hearing. The defendant then waived the right to a jury trial, and the court conducted a bench trial. Malcuit's counsel moved for judgment of acquittal on the firearm count at the conclusion of the government's case. The district court denied Malcuit's Rule 29 motion, stating: "The nature of the charge of possession of a firearm during and in relation to a drug trafficking offense is such that it does not require that the gun actually be located in such a way that it can be whipped out at a moment's notice, all ready to go and everything. It simply has to be available if it is necessary in connection with the drug trafficking offense." Counsel renewed the motion at the conclusion of all the evidence, and the court again denied it.

The court subsequently found Malcuit guilty on all four counts. In finding him guilty on Count 3 of the indictment, the court stated:

The Court further finds beyond a reasonable doubt that the defendant is guilty of Count 3, possession of a firearm during and in relation to a drug trafficking offense, in violation of Title 18, Section 924(c), United States Code.

With respect to Count 3, I would point out that the evidence shows that there were very large sums of money in the automobile, there were large quantities of drugs in the automobile. The defendant testified that he knew as a convicted felon that he was not allowed to have a gun, yet there was a gun in the car, and the proffered explanation for the reason for needing the gun simply was not convincing. And therefore, under the evidence, the Court found beyond a reasonable doubt that the defendant was guilty as charged in Count 3.

The court sentenced Malcuit to 33 months' imprisonment for the drug possession and distribution charges and to 60 months for the firearm count, imposed consecutive to the drug violation sentence, as required by § 924(c)(1).

### II.

### A.

At the trial, Malcuit admitted his guilt under the possession and distribution counts, but denied that the pistol had any connection to his drug activities. He testified that his father had given him the gun the very morning of the transaction with Crispin for protection because he was moving his family to a cottage in a remote area. Malcuit's father testified to the same effect. The defendant stated that he put the unloaded revolver in the zippered bag and never gave it a thought during his rendezvous with Crispin. Crispin testified that he did not know there was a gun in the car, and that he had seen no weapons during his past dealings with Malcuit.

The government's proof concerning events in the Burger King parking lot was sketchy. Officer Fulmer of the Willoughby Police Department gave the most precise account of what occurred after Crispin pulled his car alongside that of Malcuit. Fulmer testified

that after Malcuit left the restaurant, he was seen standing between the two vehicles talking to Crispin about how the transaction would take place. (The officer could hear the conversation as it was being recorded). Fulmer's testimony continued:

A. . . . Then I observed Mr. Malcuit go inside of his vehicle, the passenger compartment of his vehicle, retrieve that paper bag—

Q. You are referring—

A. —with the five pounds of marijuana, and place it in the back of Mr. Crispin's vehicle. That is what I observed.

Q. Thank you.

A. And then I observed Mr. Malcuit get into Mr. Crispin's vehicle in order to transact the money for the narcotics.

Officer Fulmer also testified that after Malcuit stepped out of Crispin's car, he, Fulmer, conducted a pat-down search and found no weapons on him.

**B.**

Reflecting language in the only Supreme Court decision at the time of Malcuit's trial, *Smith v. United States,* 508 U.S. 223, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993), Malcuit's counsel argued to the district court and in his opening brief here that the location of the pistol at the time of the defendant's drug activities "was coincidental and entirely unrelated to the drug offenses." Counsel contended that it was unreasonable, in view of Malcuit's unrebutted testimony concerning his acquisition and possession of the gun, to conclude that the unloaded weapon in a zippered bag on the back seat of his car somehow facilitated the drug offenses. He argued that the government had failed to prove a "nexus" between the gun and the drug activities.

The prosecution argued in the district court and in the main body of its appellate brief that the critical issues were whether the gun was accessible to Malcuit and whether its presence facilitated the drug crimes. Like the defendant, the government appears to have assumed that Malcuit's constructive possession of the weapon satisfied the "uses or carries" element of § 924(c)(1), and primarily argued that the evidence met the statute's "during and in relation to" a drug trafficking crime requirement.

The district court apparently had the same view of § 924(c)(1)'s requirements. In its first ruling on the motion for acquittal, the court referred to the "nature of the charge of possession of a firearm during and in relation to a drug trafficking offense" without mentioning the words "uses or carries." Similarly, in announcing the decision at the conclusion of the trial, the court stated that it found "beyond a reasonable doubt that the defendant is guilty of Count 3, possession of a firearm during and in relation to a drug trafficking offense." Again, there was no reference to "uses or carries." Counsels' arguments and the district court's statements reflect the very broad construction given to "uses" and the virtual elimination of "carries" from § 924(c)(1)'s requirements found in then-current decisions of this court and other courts of appeals.

A few weeks before the government filed its brief in this case, the Supreme Court handed down its decision in *Bailey v. United States,* — U.S. —, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). As discussed in greater detail in the next section of this opinion, *Bailey* gives a much narrower meaning to "uses" and indicates a correspondingly narrow reading of "carries."

In the closing pages of its brief the government attempted to show that the proof in this case satisfied the requirement that Malcuit carried the gun during and in relation to the drug offenses for which he was convicted. The government conceded, however, that "Malcuit did not 'use' the .38 caliber revolver in a manner consistent with the *Bailey* decision." In his reply brief, on the other hand, Malcuit contended that *Bailey* showed clearly that "carries" has an independent meaning from "uses," and that the statute requires proof of more than mere possession during and in relation to a drug offense. Malcuit also asserts that the government should not be permitted to argue that he carried the weapon, since at trial the prosecution sought only to prove that he used the weapon, in the sense of possessing it while engaging in the drug activities. Not surprisingly, the court

and counsel were primarily concerned with the impact of *Bailey* at oral argument.

### III.

In *Bailey,* the Supreme Court held that the use component of "§ 924(c)(1) requires evidence sufficient to show an *active employment* of the firearm by the defendant, a use that makes the firearm an operative factor in relation to the predicate offense." —— U.S. at ——, 116 S.Ct. at 505 (emphasis in original). Thus, "use" necessarily connotes "more than mere possession of a firearm by a person who commits a drug offense." *Id.* at ——, 116 S.Ct. at 506. It is not enough that the weapon be nearby and accessible for facilitation of the drug crime.

The Court emphasized that "Congress has specified two types of conduct with a firearm: 'uses' or 'carries,' " and that neither word can be considered surplusage. Yet, the broad reading given § 924(c)(1) by some courts, requiring only that a defendant put a gun into place "to protect drugs or to embolden himself," in effect reads "carries" out of the statute. *Id.* at ——, 116 S.Ct. at 507. Concluding this portion of the opinion, Justice O'Connor wrote for a unanimous Supreme Court:

> We assume that Congress used two terms because it intended each term to have a particular, nonsuperfluous meaning. While a broad reading of "use" undermines virtually any function for "carry," a more limited, active interpretation of "use" preserves a meaningful role for "carries" as an alternative basis for a charge. Under the interpretation we enunciate today, a firearm can be used without being carried, *e.g.,* when an offender has a gun on display during a transaction, or barters with a firearm without handling it; and a firearm can be carried without being used, *e.g.,* when an offender keeps a gun hidden in his clothing throughout a drug transaction.

*Id.*

Disposing of the argument that "use" requires the mere presence of a weapon if its presence emboldens or protects its owner, the Court stated that "the inert presence of a firearm, without more, is not enough to trigger § 924(c)(1)." *Id.* at ——, 116 S.Ct. at 508. Employing the synonym "storage" for such an inactive "use" as placing a weapon nearby, the Court stated, "A defendant cannot be charged under § 924(c)(1) merely for storing a weapon near drugs or drug proceeds. Storage of a firearm, without more active employment, is not reasonably distinguishable from possession." *Id.*

Finally, the Court stated that hiding a gun where the defendant can grab and use it if necessary is not enough. "If the gun is not disclosed or mentioned by the offender, it is not actively employed, and it is not 'used.' To conclude otherwise would distort the language of the statute as well as create an impossible line-drawing problem." *Id.* at ——————, 116 S.Ct. at 508–09.

### IV.

#### A.

■ The parties have framed the issue as one of sufficiency of the evidence, and we apply the familiar standard of whether the evidence was such that any rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt, viewing the evidence in the light most favorable to the government. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). This standard applies to bench trials as well as to jury trials. *United States v. Bashaw,* 982 F.2d 168, 171 (6th Cir.1992). As part and parcel of this determination, however, we have the additional task of construing the language of a statute—a question of law. Thus, we have subjected the entire record to a *de novo* review.

#### B.

In construing the language of a statute, we begin with the assumption that Congress intended each of its terms to have meaning. Further, we give to each word its "ordinary" or normal meaning, absent some indication that it is intended to be given a special meaning. *Bailey,* —— U.S. at ——, 116 S.Ct. at 508. Yet, some of our pre-*Bailey* opinions appear to fuse "use" and "carry" into a single requirement, and then to find this require-

ment satisfied by mere possession. See *e.g.*, *United States v. Acosta–Cazares*, 878 F.2d 945, 952 (6th Cir.), *cert. denied*, 493 U.S. 899, 110 S.Ct. 255, 107 L.Ed.2d 204 (1989) ("[s]ection 924(c)(1) reaches the possession of a firearm which in any manner facilitates the execution of a felony." (citation omitted)). After *Bailey*, such holdings no longer provide guidance.

The Supreme Court did not undertake to define the "carry" prong in *Bailey*, but it did note that "[t]he 'carry' prong of § 924(c)(1) ... brings some offenders who would not satisfy the 'use' prong within the reach of the statute." — U.S. at ——, 116 S.Ct. at 509. This court has considered the "carry" requirement in several decisions since the Supreme Court decided *Bailey*. In *United States v. Riascos–Suarez*, 73 F.3d 616 (6th Cir.1996), finding that *Bailey* "provides some guidance regarding the correct application of the 'carry' prong of section 924(c)(1)[,]" *id.* at 623, we held "in order for a defendant to be convicted of carrying a gun in violation of section 924(c)(1), the firearm must be immediately available for use—on the defendant or within his or her reach. Such availability takes the weapon beyond simple possession or storage." *Id.* The *Riascos–Suarez* holding was clarified in *United States v. Moore*, 76 F.3d 111, 113 (6th Cir.1996), where we indicated that immediate availability was "a necessary, but not sufficient, determinant" for finding that a defendant carried a weapon within the meaning of § 924(c)(1); "[a] definition of 'carry' that takes only availability into account ignores the term's most obvious connotation, i.e., physical transportation."

■ In *Moore*, we cited with approval a decision from a sister circuit basing a finding that a weapon was carried on the fact that it was "within effortless reach" of the defendant as he drove a car. It involved more than "mere transportation"; it required some degree of possession as well as transporting. *Id.* at 113 (quoting *United States v. Cardenas*, 864 F.2d 1528, 1530, 1533–36 (10th Cir.), *cert. denied*, 491 U.S. 909, 109 S.Ct. 3197, 105 L.Ed.2d 705 (1989)). Thus, after *Moore*, this court requires more than "mere possession" or "mere transportation" of a weapon during and in relation to the predicate offense; we

require some degree of both to find that the weapon was "carried."

We recently restated the *Moore* holding to require "the government ... [to] prove that the weapon was immediately accessible to the defendant and that the defendant was in the process of transporting the firearm during and in relation to a drug trafficking crime." *United States v. Taylor*, 102 F.3d 767, 769 (6th Cir.1996) (citing *Moore*, 76 F.3d at 113). Even more recently, we held evidence that guns were found under the front seat of the car from which the defendant was selling drugs while seated in the driver's seat was sufficient to support a conviction on § 924(c)(1)'s "carrying" charge. *United States v. Myers*, 102 F.3d 227, 236–37 (6th Cir.1996).

## C.

■ Section 924(c)(1) also requires a showing that a defendant's carrying of the firearm was contemporaneous with ("during") and "in relation to" a predicate offense. *Smith*, 508 U.S. at 237, 113 S.Ct. at 2058. The firearm must have some purpose or effect with respect to the drug trafficking crime; the mere availability of a firearm near a drug stash is not sufficient when the government fails to show a nexus between the firearm and the drug trafficking crime. Without proof of the relationship between the weapon and the crime, the coincidental or accidental placement of a firearm near cash or drugs is insufficient to sustain a conviction under 18 U.S.C. § 924(c). *Id.* at 238, 113 S.Ct. at 2058–59. In the present case, the evidence relating to the firearm shows that it was unloaded and contained within a zippered gym bag in the back seat, behind the driver's seat of Malcuit's four-door vehicle. It is unclear how far apart Malcuit's and Crispin's vehicles were parked. During the transaction for which he was convicted of distributing approximately five pounds of marijuana, Malcuit was outside of his vehicle, except for a brief interlude in which Officer Fulmer described Malcuit re-entering "the passenger compartment of his [own] vehicle" to retrieve the paper bag containing the marijuana. The evidence presented to the trial court relating to Malcuit's re-entering his

vehicle is not particularized enough for this court to determine whether the firearm would have been "within effortless reach" at that point. *Moore,* 76 F.3d at 113.

■ Malcuit was convicted of possessing marijuana with intent to distribute it as well as for the actual distribution to Crispin. Apparently he transported the weapon in the car along with the marijuana he intended to distribute at some future time. The proof disclosed no connection between the possession of the marijuana for ultimate distribution and the transportation of the weapon. Rather, there is at most evidence of "mere transportation" of the weapon and "mere possession" of the marijuana. We do not believe the fact that the weapon was transported under these circumstances satisfies the "carry" element of § 924(c)(1), even though it was transported "during" the time Malcuit possessed the marijuana for later distribution. The government made no attempt to show that Malcuit "carried" (transported) the gun "in relation to" the possession with intent crime.

### CONCLUSION

For Malcuit to be convicted under § 924(c)(1), the government must have proven beyond a reasonable doubt that in some realistic sense he "carried" the gun during and in relation to the transaction with Crispin. Because *Bailey* so significantly changed the § 924(c)(1) analysis from that previously employed by this court, we think it proper to vacate Malcuit's conviction under that statute and remand the case to the district court for further proceedings.

The judgment and sentence of the district court are **VACATED** insofar as they are based on a finding that Malcuit was guilty of violating § 924(c)(1), and the case is **REMANDED** with instructions that the district court consider the "carries" prong of the statute in light of the *Bailey* decision, based on the evidence that was heard at the trial. We **AFFIRM** the judgment in all other respects.