**UNITED STATES of America,**
**Plaintiff–Appellee Cross–**
**Appellant,**

v.

**Joe Douglas HELTON, Defendant–**
**Appellant Cross–Appellee.**

No. 00–5221, 00–5343.

United States Court of Appeals,
Sixth Circuit.

Feb. 6, 2002.

Before NORRIS and BATCHELDER, Circuit Judges; GWIN,* District Judge.

BATCHELDER, Circuit Judge.

Joe Douglas Helton appeals his conviction on charges of possession of cocaine with the intent to distribute and use of a firearm during and in relation to a drug trafficking offense. The defendant also appeals his sentence, arguing that the district court improperly sentenced him under United States Sentencing Guideline (U.S.S.G.) § 2A2.1 rather than U.S.S.G. § 2A2.2. The Government cross-appeals the sentence, claiming that the district court incorrectly applied the special offense characteristics of U.S.S.G. 2A2.1(b)(1). For the reasons that follow, we affirm the plaintiff's conviction on both counts, affirm in part and reverse in part, and remand this case for resentencing consistent with this opinion.

## PROCEDURAL HISTORY

Joe Douglas Helton ("Helton") was indicted in the Eastern District of Kentucky on one count of possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (Count I); one count of use of a firearm in a drug trafficking offense in violation of 18 U.S.C. § 924(c) (Count II), and one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1)(Count III). His co-defendant, Harold Dean McCarty ("McCarty") was indicted on Counts I and II as well as on Count IV, also a charge of being a felon in possession of a firearm.

The district court granted the United States's motion to sever the trials of the two defendants and a jury found Helton guilty on all three of the counts on which he was charged. The district court sentenced Helton to 131 months on Counts I and III, and 60 months on Count II, to run consecutively to the sentence on Counts I and III. In calculating the sentence, the court applied the attempted murder provision of U.S.S.G. § 2A2.1(a)(1), which requires a base offense level of 28. The court added three points under U.S.S.G. § 2A2.1(b)(1), finding that the victim suffered serious bodily injuries which did not rise to the level of permanent or life-threatening bodily injury. This determination raised Helton's total offense level to 31. Because Helton had prior convictions, his criminal history category was II. As a result, his sentencing range was 121–151 months. The court chose 131 months. Further, the district court determined that since Helton was indicted only for use of a weapon under 18 U.S.C. § 924(c)(1)(A), not for discharge of a weapon under that section, his maximum sentence under Count II was 5 rather than 10 years.

Helton appeals his conviction, arguing that the district court erred in denying his separate motions for judgment of acquittal on Count I and on Count II. Helton also asserts that the district court erred in sentencing him by using the incorrect guideline range for Counts I and III. Helton contends that the court improperly used U.S.S.G. § 2A2.1; rather, it should have used U.S.S.G. § 2A2.2 because he did not have the requisite intent for attempted murder or for assault with the intent to commit murder. The United States cross-appeals on the theory that the district court erred in sentencing Helton based on

* The Honorable James S. Gwin, United States District Court for the Northern District of Ohio, sitting by designation.

a 3–level adjustment under U.S.S.G. § 2A2.1(b)(1) rather than a 4–level adjustment because of the nature of the victim's injuries.

## STATEMENT OF FACTS

On June 2, 1999, Mildred Stanley Slusher ("Stanley") arrived at Helton's residence, a double-wide trailer in Magoffin County, to find Helton and McCarty "partying"—using cocaine, and drinking beer. Helton offered some of the cocaine to Stanley, and she accepted. Stanley estimates that Helton and McCarty possessed approximately eight to ten grams of cocaine in rock form. She testified that the cocaine belonged to both Helton and McCarty and that they both prepared it for sale by measuring it into nineteen half-gram packages worth $50 each. Stanley testified that during the time that they were using cocaine and preparing it for sale, both Helton and McCarty loaded and unloaded a Colt .45 caliber automatic pistol.

The following day, Helton invited Molly Minix Shepherd ("Minix") to join the "party," offering her cocaine which she accepted and used. During this time, Minix witnessed Helton handling the .45 caliber pistol. According to Minix, Helton "jokingly" claimed that the pistol was his.

With four individuals using a limited cocaine supply, McCarty and Helton realized that they needed to restock their supply to cover the cost of the amount they had used. Both Stanley and Minix testified that Helton and McCarty discussed the situation, and Helton agreed to trade his 62–inch television for one-half ounce of cocaine and $400. McCarty, driven by Stanley, went off to arrange the deal, taking the nineteen packages of cocaine with him. Less than a mile from Helton's house, McCarty told Stanley to stop the truck; Stanley watched McCarty hide the cocaine behind a traffic sign. Stanley then drove McCarty to meet the acquaintance with whom he hoped to arrange the television-for-cocaine deal. After the meeting. McCarty and Stanley returned to Helton's trailer and, with the assistance of a neighbor, loaded Helton's television into the truck. Both Helton and Minix were asleep. McCarty set off to make the trade, explaining that the round trip would take about three hours.

McCarty was actually gone for around 24 hours. During that period, Helton, Stanley and Minix began to suffer from cocaine withdrawal. Discovering that Stanley knew the hiding place of the cocaine, Helton directed her to retrieve it since, he claimed, he was entitled to one-half of it. Stanley testified that she and Minix walked to the hiding place and took five or six packs. Helton, Stanley, and Minix consumed at least five packages cocaine.

McCarty returned later that night in a rage, having gone to the hiding place and finding none of the nineteen packages of cocaine. (The whereabouts of the remainder of the cocaine is still a mystery.) McCarty accused Stanley of stealing it. Threatening with his gun and demanding to know where Stanley had put the rest of his cocaine, McCarty forced Stanley and Minix to sit to the floor of Helton's trailer. He stood over them and shot Stanley in the shoulder with the .45 caliber pistol. The bullet went through her body, exiting above her buttocks, but did not kill her. He threatened to shoot Minix as well, but Helton stopped him.

McCarty and Helton then cleaned up the blood in Helton's trailer, wrapped Stanley in a blanket, put her in the back of McCarty's truck and discussed how they should kill her and dispose of her body. Stanley attempted to escape but failed.

McCarty and Helton drove Stanley to the hiding place of the cocaine, and McCarty, threatening her with his gun, demanded that Stanley tell him where she had hidden the cocaine. When Stanley again told him that she had not taken it all, McCarty pointed his pistol at her and fired into the truck, just past her head. Stanley did not see McCarty threaten Helton during any of this period.

McCarty and Helton then drove to a strip mine where they tied cement blocks to Stanley's body and threw her into a pond. McCarty and Helton burned all of the evidence linking them to Stanley and discussed ways of killing her if she did not drown. But the water was only waist-deep and Stanley was not drowning, so Helton offered to take McCarty's gun and "make sure she goes under." Helton fired at Stanley's head three times, but missed her each time.

McCarty and Helton then pulled Stanley out of the water, telling her they would take her for help. Instead, they made her wait in the woods while they contemplated what to do next. Stanley heard Helton offer numerous suggestions, including tying her to a tree, leaving her to bleed to death and returning later to dispose of the body, or, alternatively, dumping her into a big tank located nearby where Helton opined no one would ever think to look for the body. Eventually, Stanley came out of the woods to find McCarty sleeping in his truck and Helton gone. She took the ignition keys and walked several miles through the woods to the nearest residence, from where she was airlifted to the University of Kentucky Medical Center.

At the medical center, Stanley received four units of blood. The bullet had pierced three ribs, her diaphragm, and her left lung, collapsing it. During her seven-day stay in the hospital, she underwent surgery to repair her diaphragm. Stanley also required a lung tube for breathing and utilized a breathing machine once she returned home.

Surprisingly, Stanley was alert and conscious in the hospital. Her family members testified that she stated that either Helton intentionally missed her when he fired the pistol or that God deflected the bullets. Stanley still has healed scars and on-going pain in her lower back that radiates down her leg, but she is now breathing on her own without trouble.

It is important to note that this record contains no testimony from either Stanley or Minix that either of them at any time saw or heard McCarty threaten Helton in any way.

## ANALYSIS

### I. Conviction

#### A. *Standard of Review*

Helton appeals his conviction on Count I, arguing that the government did not present evidence sufficient to prove beyond a reasonable doubt that he possessed cocaine with the intent to distribute it and used a firearm during and in relation to a drug trafficking offense. A defendant claiming insufficiency of evidence possesses a heavy burden. *United States v. Vincent,* 20 F.3d 229, 232 (6th Cir.1994). The appellate court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 233; *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Circumstantial evidence alone may sustain a conviction. *Vincent,* 20 F.3d at 233.

Helton challenges his conviction on Count II, claiming that the evidence did not prove beyond a reasonable doubt that

he had used or carried a firearm "during and in relation to a drug trafficking offense." 18 U.S.C. § 924(c). This challenge involves not only a *Jackson v. Virginia* review of the evidence but a de novo review of the district court's construction of the statute. *See United States v. Brown,* 915 F.2d 219, 223 (6th Cir.1990) (determining that a district court's construction of statute is a matter of law that an appellate court reviews de novo.).

### B. Possession of Cocaine with the Intent to Distribute

#### 1. Actual and Constructive Possession

Helton contends that he did not possess cocaine with the intent to distribute because his only actual possession of cocaine was for his personal use. The rest of the time, Helton says, McCarty kept the cocaine in his possession. Helton also would have this court believe that he cannot be found to have constructive possession of the cocaine because he never "knowingly [had] power and intention to exercise control" over it.

▆ Helton is mistaken. It is clear from the evidence that Helton knowingly or intentionally possessed a controlled substance with the intent to distribute it in violation of 21 U.S.C. § 841(a). While the Government needed only to prove either that Helton actually possessed the cocaine or that he constructively possessed it, *see United States v. Welch,* 97 F.3d 142, 150 (6th Cir.1996), the evidence reveals that Helton had both actual and constructive possession of the cocaine. Helton actually possessed the cocaine when he prepared it for his own use, when he offered it to Stanley and Minix, and when he and McCarty prepared it for sale. The jury was entitled to infer that he had constructive possession because the cocaine was in his home for the better part of two days.

*United States v. Hill,* 142 F.3d 305, 312 (6th Cir.1998). The drug contraband, such as the scale, found in Helton's home is further evidence of constructive possession of the cocaine. *Id.* at 311. Therefore, while McCarty did take the cocaine with him when he left Helton's residence, prior to that time, Helton had the ability to exercise knowing dominion and control over the cocaine. *See United States v. Reed,* 141 F.3d 644, 650 (6th Cir.1998).

#### 2. Intent to Distribute

Helton claims that his intent to distribute cannot be inferred from either the amount of cocaine in question or the presence of drug paraphernalia. However, this court does not even need to address those issues for two reasons. First, Helton's preparation of the cocaine for sale and his agreement to obtain replacement cocaine for purposes of sale by trading his television in exchange for $400 and one-half gram of cocaine are evidence of an intent to distribute. Second, this court has adopted the Fourth Circuit's rule that "a person who shares drugs with a friend possesses the drug with an intent to distribute in violation of 21 U.S.C. § 841(a)(1)." *United States v. Layne,* 192 F.3d 556, 569 (6th Cir.1999) (citing *United States v. Washington,* 41 F.3d 917, 920 (4th Cir.1994)), *cert. denied,* 529 U.S. 1029, 120 S.Ct. 1443, 146 L.Ed.2d 330 (2000). It is undisputed that Helton shared cocaine with Stanley and Minix. Therefore, he possessed the requisite intent to distribute cocaine.

▆ After reviewing the evidence in the light most favorable to the United States, we conclude that any rational trier of fact could have found that the evidence is sufficient to establish beyond a reasonable doubt that Helton possessed a controlled substance, namely cocaine, with the intent

to distribute it. Accordingly, we affirm the district court's finding of guilt on Count I.

### C. Use of a Firearm During and in Relation to a Drug Trafficking Offense

Helton claims that the district court erred in denying his motion for judgment of acquittal on Count II because, even if the evidence were sufficient to prove that he used the firearm, that use was not "during and in relation to" a drug trafficking offense because any drug usage had ceased several hours prior to the use of the gun. His use of the gun was therefore not proscribed by 18 U.S.C. § 924(c)(A), the statute under which he was charged.

The language of 18 U.S.C. § 924(c) states that "any person who during and in relation to any ... drug trafficking crime ... uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm" shall, in addition to the punishment for the drug trafficking crime, be sentenced to prison for at least five years. 18 U.S.C. § 924(c)(1)(A)(i). If the individual brandishes the firearm, the minimum sentence is seven years, 18 U.S.C. § 924(c)(1)(A)(ii); if he discharges the firearm, the minimum sentence is ten years, 18 U.S.C. § 924(c)(1)(A)(iii).

Numerous courts have interpreted and reinterpreted the plain meaning of this statute. The pivotal case interpreting 18 U.S.C. § 924(c) is *Smith v. United States,* 508 U.S. 223, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993). In that case, noting that "in relation to" is an expansive and broad phrase, *Id.* at 237, the Supreme Court stated that the firearm must "have some purpose or effect with respect to the drug trafficking crime." *Id.* at 238. The presence or involvement of the firearm cannot be the result of an accident or coincidence, and the statute's language is meant to ensure that a person who coincidentally possesses a firearm during a drug trafficking offense is not punished under 18 U.S.C. § 924(c). *Id.* Rather, the firearm must "facilitate or have the potential of facilitating the drug trafficking offense." *Id.* (internal quotations omitted).

The Supreme Court further interpreted the statutory language of 18 U.S.C. § 924(c) in *Bailey v. United States,* 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). In that case, the Court interpreted "use" to require that the evidence be sufficient to show active employment—as opposed to mere possession—of a firearm. *Id.* at 143. A firearm cannot be merely stored or placed near drugs or drug proceeds in order for it to be "used" under 18 U.S.C. § 924(c). *Id.* at 149.

This circuit has held that in order for the firearm to have been used or carried "during and in relation to the drug trafficking crime," its presence must have "furthered the purpose or effect of the crime." *United States v. Gibbs,* 182 F.3d 408, 426 (6th Cir.1999)(quoting *United States v. Riascos–Suarez,* 73 F.3d 616, 623 (6th Cir.1996)), *cert. denied,* 528 U.S. 1051, 120 S.Ct. 592, 145 L.Ed.2d 492 (1999). The Fifth Circuit. in *United States v. Tolliver,* 116 F.3d 120 (5th Cir.1997), concluded that a defendant who pulled his gun when arrested on a previous drug charge had used the firearm during and in relation to a drug trafficking offense because his action potentially facilitated the drug trafficking offense by preventing the arrest of two conspirators. *Id.* at 126. Similarly, a defendant who shot a police officer to avoid being arrested several months after he was charged with a drug offense used his firearm during and in relation to a drug trafficking offense. *United States v. Posada–Rios,* 158 F.3d 832, 861 (5th Cir. 1998). Finally, the Fourth Circuit determined that members of a drug gang who pistol whipped an individual for his failure

to allow them to hide in his home during a police sweep of the area in which they had been dealing drugs had used the firearm during and in relation to a drug trafficking offense, even though no drug deal was happening at the time. *United States v. Wilson*, 135 F.3d 291, 304–06 (4th Cir. 1998).

■ In the case before us here, the use of the gun was clearly related to the offense of possession with intent to distribute cocaine. The defendants had intended to sell the cocaine that McCarty believed Stanley had stolen from him. McCarty shot Stanley and he and Helton made other attempts to kill her because she would not tell them where the cocaine was. Like the defendant in *Wilson*, McCarty was retaliating against Stanley for her refusal to cooperate with him, and Helton was assisting. It is undisputed that the pistol was not accidentally or coincidentally involved in the situation. McCarty intentionally used it—albeit unsuccessfully—to obtain the cocaine from Stanley, and Helton intentionally discharged it three times in his attempt to kill Stanley, all as part of an ongoing attempt to find out what Stanley had done with the cocaine.

We find no error in the district court's conclusion that Helton used a firearm during and in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c). Because there is ample evidence that Helton himself used the weapon in violation of § 924(c), we need not reach the question of whether Helton could be convicted on that count under the *Pinkerton* doctrine. *See Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). Accordingly, we affirm the conviction on Count II.

## II. Sentencing

### A. Standard of Review

We review the district court's findings of fact connected with sentencing under a "deferential clearly erroneous" standard. *United States v. Cobb*, 250 F.3d 346, 348 (6th Cir.2001) (internal quotation marks omitted), *cert. denied*, —— U.S. ——, 122 S.Ct. 281, 151 L.Ed.2d 207 (2001). A district court's finding of fact is clearly erroneous only when "although there may be some evidence to support the finding, 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *United States v. Latouf*, 132 F.3d 320, 331 (6th Cir.1997) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). However, we review de novo the district court's interpretation and application of the guidelines. *United States v. Cobb*, 250 F.3d at 348.

### B. Attempted Murder

A defendant convicted under 18 U.S.C. § 922(g)(1) must be sentenced under U.S.S.G. § 2K2.1, which cross-references other guidelines sections to be used under particular circumstances. In Helton's case, the district court looked to § 2K2.1(c)(1)(A), because it concluded that Helton had used the firearm in connection with the attempt to commit another offense; § 2K2.1(c)(1)(A), in turn, directs the sentencing court to § 2X1.1. Under § 2X1.1 the sentencing court is required to use the base offense level for the substantive offense the defendant attempted if that offense level is greater than the level calculated under § 2K2.1, *see* U.S.S.G. § 2X1.1(a), unless the attempt is expressly covered by another guideline section, in which event, the court is to apply that section. *See* § 2X1.1(c).

The crux of Helton's challenge is that the district court looked to § 2X1.1(c) and applied § 2A2.1(a)(1), the guideline section

for attempted murder, instead of looking to § 2X1.1(a) and applying § 2A2.2, the guideline for aggravated assault. Helton claims that the evidence does not support the district court's conclusion that he intended to kill Stanley when he shot at her three times after helping to tie her to concrete blocks and throw her into the pond.

Helton claims that he tied Stanley loosely and he knew the water was too shallow to drown her, which demonstrates that he did not have the requisite intent for murder. He also asserts that he acted under duress because McCarty threatened him, although both Stanley and Minix testified that they never once heard or saw McCarty threaten Helton. Finally, Helton claims that he intentionally missed Stanley when he aimed the pistol at her head and fired three times and that Stanley knew that he was intentionally missing. Stanley, on the other hand, testified that after the unsuccessful shooting, he offered numerous suggestions to McCarty regarding other ways to dispose of her.

■ The felon-in-possession cross-referencing provisions of U.S.S.G. § 2K2.1 do not require that Helton be charged or convicted of the greater offense. Rather, the district court needed only to determine by a preponderance of the evidence, after examining the circumstances, that Helton possessed the intent to attempt murder. *See* U.S.S.G. § 6A1.3; *see also United States v. Watts*, 519 U.S. 148, 156, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997). Here, the district court reviewed the evidence and found that Helton had intended to murder Stanley. That finding is not clearly erroneous. Having found that Helton committed the § 922(g)(1) offense in connection with an attempted murder, the district court was bound to apply the guideline for attempted murder. Accordingly, we affirm the district court's deci-

sion to sentence Helton under the attempted murder guidelines of U.S.S.G. § 2A2.1.

### C. Permanent or Life–Threatening Injury

The United States cross-appeals the sentence, arguing that the district court committed clear error when it found that Stanley did not suffer a life threatening injury. The guideline for attempted murder contains specific offense characteristics, including the nature of the injury sustained by the victim:

> (A) If the victim sustained permanent or life-threatening bodily injury, increase by 4 levels; (B) if the victim sustained serious bodily injury, increase by 2 levels; or (C) if the degree of injury is between that specified in subdivisions (A) and (B), increase by 3 levels.

U.S.S.G. § 2A2.1(b)(1). The district court determined that Stanley's injuries fell between "permanent or life-threatening" and "serious," and imposed only a three-level upward adjustment in Helton's base offense level. The United States argues for a finding of permanent or life-threatening bodily injury, which would result in a four-level upward adjustment.

Application note 1(h) of U.S.S.G. § 1B1.1 defines "permanent or life-threatening bodily injury" as an "injury involving a substantial risk of death; loss or substantial impairment of the function of a bodily member, organ, or mental faculty that is likely to be permanent; or an obvious disfigurement that is likely to be permanent." In contrast, application note 1(j) of U.S.S.G. § 1B1.1 defines "serious bodily injury" as an "injury involving extreme physical pain or protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation."

The district court found that Stanley had suffered serious bodily injury, but refused to find that her injury was permanent or life-threatening. We have carefully reviewed the record of the sentencing proceeding, and we conclude that the district court applied an incorrect standard in determining which definition described Stanley's injuries. The district court appears to have concluded that because Stanley survived the gunshot, and because the gunshot did not cause permanent damage to any of Stanley's organs or faculties, the injury did not involve a substantial risk of death.

We think the district court misread the guidelines' definition. It is not necessary that the injury actually cause death in order to cause a substantial risk of death. And the definition is clearly in the disjunctive: "injury involving a substantial risk of death; loss or substantial impairment of the function of a bodily member, organ, or mental faculty that is likely to be permanent; or an obvious disfigurement that is likely to be permanent." One who suffers a bullet wound that pierces ribs and diaphragm, collapses a lung and requires the transfusion of four units of blood has, we think, suffered an injury causing a substantial risk of death. The risk is not obviated because, despite the severity of the injury, the victim was too tough to die. That Stanley lived to testify against Helton is a testimony to her constitution; it is certainly not because her injuries were not serious enough to cause a substantial risk of death. We hold that under a correct reading of § 2A2.1(b)(1)(A) and application note 1(h) of U.S.S.G. § 1B1.1, Stanley suffered a life-threatening injury. We therefore reverse the district court's determination that the base offense level be increased by only three levels.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of conviction; we AFFIRM in part and REVERSE in part the sentence; and we REMAND for resentencing consistent with this opinion.