IN THE SUPREME COURT OF TEXAS








IN THE SUPREME COURT OF TEXAS
 
════════════
No. 05-0126
════════════
 
City of 
Rockwall, Texas, Petitioner,
 
v.
 
Vester T. Hughes, as Sole 
Independent Executor of the Estate of W. W. Caruth, 
Deceased, Respondent
 
════════════════════════════════════════════════════
On Petition for Review from the
Court of Appeals for the Fifth District of 
Texas
════════════════════════════════════════════════════
 
 
Argued January 25, 
2006
 
Justice Willett, joined by Justice Hecht, Justice O’Neill, and 
Justice Brister, dissenting.
                                                                        

The Court 
espouses sound principles of statutory construction but unsoundly applies them. 
Basically, it takes literalism too literally. Read naturally, section 
43.052(i) means this: landowners who request inclusion 
of their land in a city’s annexation plan may arbitrate the city’s failure to 
include it.
The City’s 
position—arbitration is only available if the City ignores the petition, 
not if it rejects it—makes little sense. Studied in context, the 
arbitration-triggering phrase “fails to take action” in section 43.052(i) has a more substantively coherent meaning than “fails to 
take any action”; it necessarily means “fails to take favorable 
action.” Landowners are seeking a specific outcome: inclusion in the city’s 
annexation plan. The statute grants arbitration if the property remains 
excluded, and exclusion persists just as surely through adverse action as 
through inaction.
            
The meaning of “fails to take action” is best revealed by how this phrase 
is used in another Chapter 43 arbitration provision. Applying today’s wooden 
construction to that provision dictates an illogical result that lays bare the 
Court’s misinterpretation. As discussed more fully below, the Court’s literalist 
interpretation would deny residents of areas annexed by the City of Houston their statutory 
right to arbitrate the City’s failure to provide municipal services to the 
annexed area if the City rejects the residents’ petition to enforce the service 
plan. As the Court reads “fails to take action,” Houstonians deprived of basic 
city services will have no private remedy.
            
Read as a whole, the statutory scheme—in both section 43.052(i) and in section 43.056(l)—is straightforward and 
cannot bear the narrow meaning the Court ascribes to it. The Court’s unduly 
restrictive reading is foreclosed by statutory context, and because context 
matters, I respectfully dissent.
I. When Searching 
for Statutory Meaning,
Words Matter–And 
So Does Context
 
            
The Court aptly describes, then misapplies, the 
pertinent ground rules for construing statutory language. Words and phrases must 
be read “in context and construed according to the rules of grammar and common 
usage.”[1] The import of language, plain or not, 
must be drawn from the surrounding context, particularly when construing 
everyday words and phrases that are inordinately context-sensitive.[2] Given the power of context to transform 
the meaning of language, courts should resist rulings anchored in 
hyper-technical readings of isolated words or phrases,[3] or forced readings that are exaggerated 
or, at the other extreme, constrained.[4]
            
This “context matters” maxim—a cardinal rule not only of statutory 
construction but “of language itself”[5]—is rooted in common sense,[6] Texas statutory law,[7] and caselaw 
from both this Court[8] and the United States Supreme Court.[9]
            
Accordingly, when interpreting the (h)(1) 
exemption for quick annexation of rural land and the arbitration remedy in 
subsection (i), we must consult the text and structure 
of surrounding and related provisions. Doing so yields a clear and forthright 
interpretation that confirms the statute’s natural meaning while giving effect 
to every part of the statute.
            
Subsection (i) begins: “A municipality may not 
circumvent the [three-year plan] requirement[ ] by proposing to separately annex 
two or more areas described by Subsection (h)(1) if no reason exists under 
generally accepted municipal planning principles and practices for separately 
annexing the areas.” This proscriptive language sets the context; lawmakers 
intended arbitration to curb the overzealous use of expedited, piecemeal 
annexations under subsection (h)(1) in order to evade 
the three-year planning requirement.
            
Ignoring this context, the Court adopts the City’s view that “fails to 
take action” means “fails to take any action,” in other words, when a 
city succumbs to bureaucratic inertia and does nothing. But if a city rejects a 
petition outright, the landowner has no further recourse.[10] This interpretation subverts the 
Legislature’s effort to curb abusive annexation tactics.
            
The City complains that Hughes’s interpretation requires arbitration of 
all requests, no matter how groundless, but the City’s rigid interpretation 
enables it to deny all requests, no matter how meritorious. The Court’s holding 
will effectively prescribe, not proscribe, the very circumvention that 
subsection (i), by its terms, was intended to cure.[11]
            
In context, the phrase “fails to take action” captures not only a city’s 
inaction but also a city’s overt denial of favorable action. The word 
“favorable” is implicit, honors the phrase’s (and the overall statute’s) 
common-sense meaning, and gives full effect to the statute’s objective: giving 
landowners a specific and workable remedy against abuse of the (h)(1) exemption. In my view, the language cannot fairly be 
read any other way, and the Court’s reading almost certainly undermines the 
Legislature’s intent.
II. The Court’s Strained Reading 
Invites Absurd Results
            
The Court acknowledges that any interpretation, literal or not, that 
produces absurd results should be discarded.[12] In my view, the Court’s interpretation 
works multiple absurdities.
 
A. The Undeniable 
Meaning of “Fails to Take Action” Elsewhere in Chapter 43
Undercuts the 
Court’s Literalist Construction of Subsection (i)
 
            
Most disconcerting is that the Court’s noncontextual analysis cannot be squared with other parts of 
Chapter 43, principally section 43.056, which centers on the City of Houston’s 
contractual duty to provide must-have services to areas slated for annexation 
(e.g., fire and police protection, EMS, road maintenance, solid waste 
collection, water and wastewater facilities).[13] The Legislature in subsection (l) 
authorizes Houston residents and landowners to request 
arbitration to force compliance with the City’s service plan, and, strikingly, 
it uses the very same “fails to take action” phrase that appears in section 
43.052(i). Subsection (l) provides:
 
A person 
residing or owning land in an annexed area . . . may enforce a service plan by 
petitioning the municipality for a change in policy or procedures to ensure 
compliance with the service plan. If the municipality fails to take action 
with regard to the petition, the petitioner may request arbitration of the 
dispute . . . .[14]
 
 
Under 
long-settled authority, “fails to take action” must mean the same thing here as 
it does in section 43.052(i).[15] The multiple parallels at work here—the 
same phrase enacted the same day in the same bill describing the same 
proceeding—could not present a more “classic case for application of the normal 
rule of statutory construction that identical words used in different parts of 
the same act are intended to have the same meaning.”[16]
            
I venture this prediction: if today’s case centered not on subsection 
(i) but on subsection (l) and a Houston 
resident’s request to arbitrate the City’s alleged breach of a service plan, the 
Court would read “fails to take action” exactly as I read it in subsection 
(i). Studied consistently and contextually, the 
meaning is self-evident: someone in an annexed area can request arbitration to 
enforce the service plan if the city grants no relief on the petition.
            
Applying today’s construction of “fails to take action,” however, if the 
City of Houston 
denied a service-plan enforcement petition, arbitration would be unavailable. 
This reading runs head-long into subsection (l)’s two-step process for 
enforcing City of Houston service plans: (1) a petition urging 
the City to comply, then (2) arbitration if the petition produces no compliance. 
The notion that arbitration is possible only if the City refuses to move a 
bureaucratic muscle is conceptually untenable. The paramount goal of 
service-plan enforcement is illusory if the City of Houston can foreclose a 
service-plan challenge simply by rejecting the petition outright. Such a result 
would render subsection (l) wholly impotent and allow the concerns that 
prompted its enactment to thrive unchecked.[17] The landowner is seeking to compel 
obedience to the service plan—a formal “contractual obligation”[18]—and vital city services will remain 
unprovided whether the City rejects the petition or 
ignores it; granting arbitration only if the City’s response is dilatory, but 
not if it is direct, works an absurd result.
            
The very next sentence in subsection (l) removes any doubt that 
the Legislature intended “fails to take action” to mean “fails to take favorable 
action.” It authorizes persons living outside of Houston to apply for a writ of mandamus to prod 
service-plan compliance from their respective cities.[19] It cannot possibly be the law that every 
Texan outside the Houston city limits can freely and immediately 
seek mandamus relief to enforce their cities’ service plans while Houstonians 
deprived of basic services and whose enforcement petitions are rejected must 
hope exclusively for a State-led quo warranto action. 
Again, this result defeats the fundamental purpose (and contractual promise) of 
the service-plan statute, but it is necessitated by the Court’s construction of 
section 43.052(i).
            
Chapter 43 is most coherent and consistent when “fails to take action” 
means the same thing in both provisions. The Court, however, cites “context” to 
reserve the right to interpret subsection (l) differently because 
“sections 43.052(i) and 43.056(l) not only differ in 
the types of disputes they address, but also in how arbitrations of those 
disputes are to be conducted.”[20] That is true, but also irrelevant; the 
decisive “fails to take action” language is word-for-word identical and operates 
the same way—the triggering phrases are grammatical and structural twins—and 
there is no principled basis for distinguishing the indistinguishable.[21]
 
B. The City Says 
Arbitration Is Possible “Only Under the Narrowest of Circumstances”–Namely, When 
a City Volunteers
                                    

            
The City’s view, at its core, is that a landowner entitled to request 
arbitration is never entitled to receive arbitration. Rather, 
subsection (i) is “an essentially consensual remedy of 
limited applicability,” something vested in the City’s absolute discretion.[22] I disagree that cities are only 
subjected to arbitration if they choose to be. Section 43.052(i), like the identically worded section 43.056(l), 
grants an actual remedy, not a “consensual” one and not merely a request for 
one.
            
The Court’s “consensual remedy” holding endorses a path by which cities 
may circumvent the legislatively preferred three-year plan: “Just Say No”—deny everything and arbitrate nothing. Under this view, if a 
city (for reasons I cannot imagine) wanted to cede some of its planning 
authority, it would ignore the petition. But if a city wanted to retain 
unfettered control, it would deny the petition. Given how cities prize and 
safeguard their municipal annexation authority,[23] no rational city would ever renounce 
power by ignoring a petition when it could redouble power by denying it. If the 
Legislature intended only to authorize cities to volunteer for arbitration, then 
no statute was necessary as home-rule cities already possess “all the powers of 
the state not inconsistent with the Constitution, the general laws, or the 
city’s charter.”[24] A city that wants to arbitrate something 
does not need a statute granting it permission. Because “the legislature is 
never presumed to do a useless act,”[25] we must presume that it intended 
something more than voluntary arbitration.
            
More revealing, though, is the City’s argument that all this sound and 
fury about arbitration and inclusion in the city’s annexation plan signifies 
nothing because the fast-track nature of (h)(1) 
annexations will quickly moot the entire dispute. As the City noted at oral 
argument: “If the landowner asks to be included in a three-year plan, the city 
sits on it, that remedy or rather any consideration of whether it should be in a 
three-year plan is lost [once the area is annexed].”
            
The underlying facts illustrate the City’s position that all landowner 
action under subsection (i) is ultimately futile:
$     the Estate proposed to the City a high-density housing plan 
in the City’s extraterritorial jurisdiction (ETJ)
 
$          
five days later the City directed its staff to 
begin expeditious (h)(1) annexation (goal: to bring the property within the City 
limits so it could impose low-density development restrictions)
 
$         
the Estate then petitioned for inclusion in the City’s 
three-year plan (goal: to delay the (h)(1) annexation so it could vest the 
property’s high-density development plan)
 
            
Under the City’s position, heads the city wins and tails the landowner 
loses. The calendar is inexorable. Arbitration is forever a mirage because even 
if a landowner is theoretically entitled to arbitration, the City’s 
annexation—the very annexation being challenged—zooms along the (h)(1) fast track, thus short-circuiting the dispute.
C. The City’s “Pocket Veto” Analogy Is Facially off the Mark
            
The City says arbitration is possible in exactly one situation: “when a 
city refuses to consider or evaluate the request—exercising the proverbial 
‘pocket veto.’” The pocket-veto analogy is inapposite because a pocket veto, 
classically understood, quickly yields a definitive outcome: rejection.[26]
            
Accepting arguendo the City’s pocket-veto 
characterization, the Legislature, unlike the United States Constitution, has 
failed to define the contours, and the Court avoids addressing these concerns,[27] most notably (1) how much time must 
elapse before the landowner may request arbitration? and (2) what form of “action” suffices to derail 
arbitration?[28]
            
Subsection (i) is open-ended and sets no 
decision-making deadline by which a city must respond to a landowner’s petition. 
If a city sits idle, a landowner has no way of knowing whether the city has 
merely failed to open its mail or, alternatively, has in fact reviewed the 
petition but quietly decided not to grant it. What length of city inaction is 
sufficient before a landowner may seek arbitration? Meanwhile, as the landowner 
awaits a formal response, the city continues speedily annexing the targeted 
property under subsection (h)(1).
            
Moreover, the Court, while purporting to construe “fails to take action” 
literally, actually spurns its own literalist method. The Court says arbitration 
is unavailable because the City’s categorical refusal amounts to “action.” The 
word “action,” however, encompasses a wide range of activities: reviewing a 
petition, conducting research, convening a hearing, deliberating, etc.[29] Why are these actions not “action”? The 
Court implicitly limits the word “action” to mean dispositive action—when 
a city formally denies a petition—but the Court cites nothing to explain why 
nondispositive action fails to qualify. 
By restricting “action” to a yes-or-no decision,[30] the Court has in fact abandoned 
literalism by reading the statute to mean “fails to take final action,” a 
locution that, notably, lawmakers have used elsewhere in the Local Government 
Code regarding land use regulation, but not here.[31] The Court thus allows context to inform 
the meaning of “action,” but it does so selectively, picking and choosing when 
it will permit context to guide its statutory analysis.
 
III. The 
Legislature Enacted a Specific Alternative to Quo Warranto
in Cases of Alleged Abuse of Subsection 
(h)(1)
 
            
The Court says landowners are no worse off given the possibility of 
State-initiated quo warranto intervention. The Court 
reasons that annexation law is largely procedural and that our 1991 decision in 
Alexander Oil Co. v. City of Sequin declared quo warranto the exclusive mechanism to challenge improperly 
conducted annexations.[32] The Court’s analysis is 
unconvincing.
            
The Legislature is presumed to understand extant law when it enacts 
legislation,[33] and if it intended that quo warranto remain a landowner’s sole remedy against post-1999 
annexation abuses, it would not have enacted a statute that explicitly grants a 
private arbitration right.[34] This Court recently held that the 
“truest manifestation” of what lawmakers intended is what lawmakers enacted—the 
text they actually voted on—and the intent to supersede Alexander Oil is 
found in a statute that does exactly that.[35]
            
We decided Alexander Oil in 1991 largely on the basis that the 
Legislature had not yet given private individuals a way to challenge 
annexations. Eight years later, the Legislature did so, granting landowners a 
defined arbitration right.[36] The Legislature, we must presume, 
understood the role of quo warranto in challenging 
annexation proceedings when it provided for arbitration in subsection (i), but the Legislature’s comprehensive overhaul makes no 
mention of quo warranto, much less retains the 
exclusivity of such relief. The City insists the Legislature’s failure to 
unequivocally declare that it was superseding Alexander Oil indicates it 
never intended to do so. We have never required such declarations, and 
Alexander Oil overtly disclaims the necessity for any such declaration: 
quo warranto, we said in that case, is the way to 
attack annexation irregularities unless the Legislature has “acted to 
expressly provide a private action.”[37] The Legislature did precisely that 
post-Alexander Oil.[38]
            
This 1999 legislative exception to the general quo warranto rule provides a simple yet substantive remedy that 
is complete unto itself: the landowner petitions for inclusion in the three-year 
plan, and if the land is not added, the landowner may seek arbitration. 
Subsection (i) never states or suggests that quo warranto remains part of the legal landscape or that quo 
warranto must precede arbitration as an intermediate 
step.
            
Finally, the City’s reliance on three courts of appeals’ decisions 
construing section 43.052 as strictly procedural, and thus subject only to quo 
warranto challenge, is misplaced.[39] While those courts held that quo warranto is the sole means to attack a city’s alleged 
violation of 43.052, none of those decisions considered the (h)(1) exemption or 
interpreted subsection (i), focusing instead on other 
portions of section 43.052.
            
The remedy for abuse of the sparsely-populated-area exemption is 
arbitration, which subsection (i) clearly 
authorizes.
IV. Conclusion
            
The statute in this case speaks for itself. The Court mutes the statute, 
however, by fixating on four words divorced from the surrounding statutory 
framework. I agree judges must adhere to the language that lawmakers voted on, 
but statutes operate as a whole and must be read as a whole, not as a hodgepodge 
of isolated fragments. The Court’s noncontextual 
reading is incompatible with related provisions (including one identical 
provision) in the same statute. Literalism can sometimes border on trivialism and should not be confused with textualism, which considers both statutory text and 
statutory context to ascribe meaning. Today’s decision is literalism gone 
bad.
            
Hughes is statutorily entitled to arbitration, and because the Court 
“fails to take action” to enforce that remedy, I respectfully dissent.
                                                                        

 
            
____________________________________
            
Don R. Willett
            
Justice
 
Opinion delivered: January 25, 
2008










[1] 
Tex. Gov’t Code § 311.011(a).

[2] 
Id. 
Some familiar words, depending on how they are used, convey polar opposite 
meanings. For example, the word “sanction” may indicate approval (“I sanction 
eating that bowl of ice cream.”) or disapproval (“My wife will sanction me for 
eating that bowl of ice cream.”). See Webster’s New World Dictionary & Thesaurus 
566 (Michael Agnes, ed., 2d ed. 2002). Its meaning—permission or 
prohibition—turns entirely on context.

[3] 
Tex. Dep’t of Transp. v. City of 
Sunset Valley, 146 S.W.3d 637, 642 
(Tex. 2004) 
(“We must read the statute as a whole and not just isolated 
portions.”).

[4] 
Cities of Austin, Dallas, Ft. 
Worth, & Hereford v. Sw. Bell Tel. Co., 92 S.W.3d 434, 442 
(Tex. 
2002).

[5] 
Deal v. United States, 
508 U.S. 129, 132 (1993).

[6] 
As noted above, some words are auto-antonyms that can mean diametrically 
opposite things depending on the context. The word “fast,” for example, can mean 
“swift” or “firmly fastened.” See Webster’s, supra note 2, at 233. 
The word “cleave” can mean “to adhere” or “to divide.” See id. at 112. In my view, the Court’s decision today “cleaves” to a 
myopic approach that “cleaves” literal meaning from plain meaning.

[7] 
See Tex. Gov’t 
Code § 
311.011(a).

[8] 
For example, in Tooke v. City of Mexia, 197 
S.W.3d 325 (Tex. 2006), our sole objective was to define 
the meaning of “sue and be sued”-type language. Rather than concluding that 
these simple and apparently unambiguous words have one, definitive meaning, we 
recognized that “the import of these phrases cannot be ascertained apart from 
the context in which they occur.” Id. at 
329; see also, e.g., City of Sunset Valley, 146 S.W.3d at 642.

[9] 
In Deal, the Court identified numerous possible meanings of “conviction” 
in a bank robbery statute but reasoned that “of course susceptibility of all of 
these meanings does not render the word ‘conviction,’ whenever it is used, 
ambiguous; all but one of the meanings is ordinarily eliminated by context.” 
508 U.S. at 131-32.
                
    The author of Deal, Justice Scalia, was 
determined to drive home this point, as he wrote a dissent two weeks later in 
Smith v. United States, 508 U.S. 223, 241-47 (1993), which centered on 
the meaning of “using a firearm” and where Justice Scalia again stressed the 
importance of giving words their fair meaning: 
To use an instrumentality ordinarily means to use it for 
its intended purpose. When someone asks, “Do you use a cane?,” he is not inquiring whether you have your grandfather's 
silver-handled walking stick on display in the hall; he wants to know whether 
you walk with a cane. Similarly, to speak of “using a firearm” is to 
speak of using it for its distinctive purpose, i.e., as a 
weapon.
Id. at 242.
                
    The Court is equally attuned to context in civil 
cases. In Textron Lycoming Reciprocating Engine Division v. UAW of 
America, 523 U.S. 653 (1998) (construing “suits for violation of 
contracts”), the Union urged a narrow focus on the meaning of the preposition 
“for,” but the Court refused to turn statutory interpretation into a brain 
teaser and instead insisted on a natural reading that examined each word in 
context, not under a microscope. Id. at 656-58 (“It is not the meaning 
of the word ‘for’ we are seeking here, but the meaning of ‘[s]uits for violation of contracts.’” (alteration in original)).

[10] While this opinion uses the term 
“landowner” for simplicity, section 43.052(i) makes 
clear that a petitioner may be either “a person residing or owning land in the 
area.” Id.

[11] The record suggests that few cities enact 
three-year municipal annexation plans. In fact, amicus curiae The Texas 
Municipal League (“TML”), an association of more than 1,070 incorporated cities 
that advocates municipal interests, notes that many of its member “cities will 
have a one page plan stating that they do not intend to annex any area for which 
an annexation plan is required.” See Scott N. Houston, Tex. Mun. League, 
Municipal Annexation in Texas: “Is It Really That Complicated?” 
13 (2003, updated Nov. 2004), available at 
http://www.tml.org/legal_pdf/ANNEXATION111704.pdf. The City of Rockwall’s 
annexation “plan” is a near carbon copy: “[t]he City does not intend to annex 
any territory that in order to be annexed, is required 
to be in an annexation plan.” City of Rockwall, Tex., Ordinance 99-49 
(Dec. 20, 1999). Hughes argues that such “plans” clash with a key 
objective underlying the Legislature’s 1999 rewrite, that annexation decisions 
should be driven not by circumvention of the three-year planning process but by 
order, thoughtfulness, and predictability. Judging by the myriad amicus briefs 
filed by Texas 
cities, expedited annexations under (h)(1) are so 
common that (h)(1) is actually the rule. TML’s brief 
admits as much, saying the (h)(1) exception “is 
routinely used by most home rule cities. Only a handful of 
cities annex under an annexation plan” at all.

[12] See __ S.W.3d. __.

[13] The statute defines the service plan as a 
contract between the city and the annexed area. Tex. Loc. Gov’t Code § 43.056(k) (“On 
approval by the governing body, the service plan is a contractual obligation . . 
. .”). This contract establishes the method that the city will follow in 
extending services to the newly annexed area. Tex. Loc. Gov’t Code § 43.056(b).

[14] Tex. Loc. Gov’t Code § 43.056(l) 
(emphasis added). Compare this statute with section 43.052(i): “If the municipality fails to take action on the 
petition, the petitioner may request arbitration of the dispute.” It seems 
beyond serious dispute that “fails to take action with regard to the 
petition” in subsection (l) means exactly the same thing as “fails to 
take action on the petition” in subsection (i).

[15] See Comm'r of 
Internal Revenue v. Lundy, 516 U.S. 235, 249-50 (1996), 
superseded by statute, Taxpayer Relief Act of 1997, Pub. L. No. 105-34, 
sec. 1282(a), 111 Stat. 1037 (codified as amended at 26 U.S.C. § 6512); see 
also Dallas 
County Cmty. Coll. Dist. v. Bolton, 185 S.W.3d 868, 873 
(Tex. 2005) (“We must interpret a statute 
according to its terms, giving meaning to the language consistent with other 
provisions in the statute.”); Paddock v. Siemoneit, 218 S.W.2d 428, 435 (Tex. 1949) (observing 
that the same words must be given the same meaning unless context dictates 
otherwise).

[16] Lundy, 516 U.S. at 250 (internal quotation marks omitted) 
(quoting Sullivan v. Stroop, 496 
U.S. 478, 484 (1990)); see also 
Paddock, 218 S.W.2d at 435.

[17] See Houston, supra note 11, at 5-8 (describing the furor 
surrounding the City of Houston’s annexation of 
suburban Kingwood in 1996, a controversy that fueled the Legislature’s 1999 
overhaul of Texas annexation law).

[18] See supra note 13.

[19] Tex. Loc. Gov’t Code § 43.056(l) 
(“A person residing or owning land in an annexed area . . . may enforce a 
service plan by applying for a writ of mandamus . . . .”).

[20] __ S.W.3d __.

[21] Besides eviscerating the arbitration 
provision in section 43.056(l) regarding service-plan enforcement, the 
Court’s holding also nullifies parts of section 43.056(i) above and beyond the arbitration provision itself. For 
example, subsection (i) features a cost-shifting 
penalty provision whereby arbitrators can sanction landowners if the petition 
was “groundless or requested in bad faith or for the purposes of harassment.” It 
is inconceivable, however, that any right-minded city 
would ever submit to city-funded arbitration of any petition, much less a 
baseless one, if it knew that it could dodge arbitration just by denying the 
petition outright.

[22] At oral argument, the City insisted that a 
valid arbitration request alone cannot trigger arbitration or justify a court 
order compelling arbitration:
 
                                                
    COURT: So does 43.052 give a private landowner any 
right at any time under any circumstances to sue for an order compelling 
arbitration?
 
                                                
    
RESPONSE:           No, it 
doesn’t. . . .
 
                                                
    COURT: So even when the city fails to act one way or 
the other, they sit on it for whatever reason, there is still no private right 
of action to compel arbitration?
 
                
    
RESPONSE:           Well, 
that’s correct. We take that position. . . .          
   

[23] Cities regard the broad, unilateral power 
to annex as a matter of municipal life and death: “According to many national 
authorities, this annexation power is the primary difference between the 
flourishing cities of Texas and the declining urban areas in other 
parts of the nation.” See Houston, supra note 11, at 10.

[24] Proctor v. Andrews, 972 S.W.2d 729, 
733 (Tex. 
1998) (observing that the Legislature may restrict the power of home-rule cities 
that derive their plenary power directly from the 
Constitution); see also Tex. Const. Art. XI, 
§ 5.

[25] Hunter v. Fort Worth Capital Corp., 
620 S.W.2d 547, 551 (Tex. 1981); see also 
Travis County v. Pelzel & Assocs., Inc., 77 
S.W.3d 246, 249-50 (Tex. 2002), superseded by statute, 
Tex. Loc. Gov’t 
Code § 262.007; Liberty Mut. Ins. Co. 
v. Garrison Contractors, Inc., 966 S.W.2d 482, 
485 (Tex. 
1998).

[26] A true pocket veto occurs when the 
President fails to sign a bill passed by Congress within ten days, if Congress 
is not in session at the end of those ten days. U.S. Const. art. 
I, § 7, cl. 2; see also The Pocket Veto Case, 279 U.S. 655 (1929). Timing 
is the critical element. The President can only kill legislation with a pocket 
veto if Congress adjourns before the ten days expire; if Congress remains in 
session, and ten days elapse, then the bill automatically becomes law without 
the President’s signature. U.S. Const. art. 
I, § 7, cl. 2.

[27] __ S.W.3d __.

[28] The City argues that two other Texas statutes use the 
phrase “fails to take action” to mean “fails to take any action” and not 
overt rejection. See Tex. Loc. 
Gov’t Code § 232.096 (authorizing commissioner’s courts to approve or 
disapprove plat decisions of a land planning commission and providing that if 
the court “fails to take action” within thirty days, the commission’s decision 
becomes final); Tex. Occ. Code § 
262.1025 (authorizing the State Board of Dental Examiners to review rules 
proposed by an advisory committee and providing that if the board fails to take 
action on the recommendation within ninety days, it must adopt the 
recommendation). These two statutes are facially different. In both, one 
governmental body is reviewing the prior decision or proposal of another 
governmental body; if the reviewing body “fails to take action” for a specified 
number of days, the prior decision is ratified by operation of law. The 
annexation statute, by contrast, lacks this critical “deeming” feature. The 
City’s theory leaves the landowner in perpetual limbo since inaction is never 
treated as either approval or rejection of the landowner’s petition, no matter 
how much time elapses. Meanwhile, the challenged annexation proceeds unabated. 
The reason the identical phrase “fails to take action” is interpreted 
differently in these other statutes is because the surrounding language is 
different in these other statutes. Again, context controls.

[29] According to Black's Law Dictionary, "action" means 
"[t]he process of doing something; conduct or behavior." Black's Law Dictionary 31 (8th ed. 
2004).

[30] See, e.g., __ S.W.3d __ (“[T]he city failed to take action on it one way or the other . . 
. .”).

[31] The Legislature, for example, says if a 
county planning commission “fails to take final action” on a completed 
plat application within sixty days, the applicant may seek mandamus relief “to 
compel the planning commission to approve or disapprove the plat.” Tex. Loc. Gov’t Code § 232.096(g) 
(emphasis added).

[32] 825 S.W.2d 434, 436-37 (Tex. 1991).

[33] In re Pirelli Tire, L.L.C., __ 
S.W.3d __ (Tex. 2007).

[34] Again, “the legislature is never presumed 
to do a useless act.” Hunter v. Fort Worth Capital 
Corp., 620 S.W.2d 547, 551 (Tex. 1981).

[35] Alex Sheshunoff Mgmt. Servs., L.P. v. 
Johnson, 209 S.W.3d 644, 651–-52 (Tex. 2006).

[36] Act of May 31, 1999, 76th Leg., R.S., ch. 1167, § 4, sec. 43.052(i), 
1999 Tex. Gen. Laws 4074, 4076-77.

[37] Alexander Oil, 825 
S.W.2d at 437.

[38] The Court posits the specter of multiple 
“individual arbitration proceedings” as another basis for its pro-quo-warranto holding. __ S.W.3d. __. To 
be sure, the City and various amici predict calamitous 
and “drastic implications” if we interpret the statute to provide a private 
arbitration right. I concede that landowner-invoked arbitration may well saddle 
cities with real and nonincidental costs. I also 
understand the City’s fear that developers will (1) target areas within the ETJ 
for dense, out-of-character projects that clash with the city’s overall vision 
for the area and (2) use arbitration under subsection (i) as a delaying tactic or as negotiating leverage. These 
arguments, however, are rooted in policy and prudential concerns, which are 
quintessential legislative judgments, not judicial ones. Burdensome or not, the 
costs and hassles attending arbitration were, I would conclude, presumed 
acceptable by the Legislature, and in any event, avoidable if cities 
scrupulously complied with the statute’s three-year annexation plan requirement 
in lieu of successive fast-track annexations under (h)(1).

[39] The City cites Werthmann v. City of Fort Worth, 121 S.W.3d 
803, 807 (Tex. App.—Fort Worth 2003, no pet.); City of Balch Springs v. 
Lucas, 101 S.W.3d 116, 122 (Tex. App.—Dallas 2002, no pet.); City of San 
Antonio v. Hardee, 70 S.W.3d 207, 212 (Tex. App.—San Antonio 2001, no 
pet.).