NEWSOM, J., concurring in part and dissenting in part:
If forced to choose a favorite movie, I'd have to go with A Man for All Seasons , which chronicles Sir Thomas More's heroic, principled-to-the-death stand against King Henry VIII's effort to procure a divorce from Catherine of Aragon-and in the process anoint himself the head of his own newly-formed church. (Christopher Nolan's Inception runs a close second, for sheer mind-blowing awesomeness, but I digress ....) My favorite scene from my favorite movie: a testy dialogue between More and his son-in-law-to-be, the ever-zealous Richard Roper. Roper, anxious that the opportunistic hanger-on Richard Rich intends to double-cross More, who was then serving as the Lord Chancellor of England, pleads (along with More's wife and daughter) to have Rich arrested on the ground that he's "bad"-to which More responds, impassively, "There's no law against that." To the objection that while they go on "talk[ing]," Rich has "gone," More rejoins, more emphatically: "And go he should even if he were the Devil himself until he broke the law ." Then, this gem-
Roper: So, now you'd give the Devil benefit of law!
More: Yes. What would you do? Cut a great road through the law to get after the Devil?
Roper: Yes, I'd cut down every law in England to do that!
More: Oh? And when the last law was down, and the Devil turned round on you-where would you hide, Roper, the laws all being flat? This country is planted thick with laws from coast to coast-man's laws, not God's-and if you cut them down-and you're just the man to do it-do you really think you could stand upright in the winds that would blow then? Yes, I'd give the Devil benefit of law, for my own safety's sake.[1]
* * *
I knew this day would come-eventually, I'd have to hold my nose and cast (and then explain) a vote that I found utterly nauseating. Well, here we are. I couldn't *941 agree more with the majority-and the staffer-drafters of H.R. Rep. No. 99-910, whoever they were-that "[o]f all the crimes known to our society, perhaps none is more revolting than the sexual exploitation of children, particularly for the purposes of child pornography." Maj. Op. at 936. And happily for me, Congress has given prosecutors plenty of ammunition to try, convict, and sentence the purveyors and consumers of child porn. But, I respectfully submit, the majority's construction of 18 U.S.C. § 2251(d)(1) -to hold that when Caniff sent a private, person-to-person text message requesting explicit photos he "ma[de]" a "notice" for them-stretches that particular provision beyond the breaking point.
To be clear, I'm not suggesting that Caniff is the "Devil himself" (although the crimes of which he has been convicted are most assuredly devilish). Nor am I in any way intimating that the majority's construction of § 2251(d)(1) is tantamount to "cut[ting] down every law in [America]"-the majority's interpretation is plausible, even if (I think) incorrect. And I am most certainly not casting myself in the role of the inimitable More. I'm simply saying that as badly as I'd like to get Caniff-to see him rung up on every count of the indictment-my job is to take the law as I find it, and however regrettable it may be to me, I cannot conclude that § 2251(d)(1) reaches Caniff's conduct here.
I
In relevant part, 18 U.S.C. § 2251(d) prescribes stiff prison sentences-15 years to life-for any person who
knowingly makes , prints , or publishes , or causes to be made, printed, or published, any notice or advertisement seeking or offering ... to receive ... any visual depiction, if the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct.
Id. § 2251(d)(1)(A) (emphasis added).
The majority doesn't contend that when Caniff sent a private text message to "Mandy" requesting photos, he "print[ed]" or "publishe[d]" anything-either a "notice" or an "advertisement." Nor does the majority contend that Caniff "ma[de]" an "advertisement" for pornographic images. Rather, the majority holds that by sending his text message Caniff "ma[de]" a "notice" for porn. Maj. Op. at 932. That seems wrong to me for two reasons.[2]
A
First, and most obviously, that's just not how people talk. One would be hard-pressed to find any ordinary English *942 speaker who would think that he "makes" a "notice" by conveying a request via text message. If I send a text to my son asking him to pick up some milk on the way home from school, have I "ma[de]" a "notice" for milk? And in turn, when he receives my message, would he plausibly turn to his friends and say, "I've got to run by the store-my dad has made a notice that we need milk"? I don't think so. Caniff's request wasn't nearly so innocuous, of course, but he no more "ma[de]" a "notice" than I did. The majority's expansive construction seems to me to privilege how statutory terms might conceivably be used as opposed to-as I think preferable-how they are used "in their ordinary and usual sense." Caminetti v. United States, 242 U.S. 470, 485-86, 37 S.Ct. 192, 61 L.Ed. 442 (1917).
B
Second-and this will require a bit more unpacking-there is the matter of statutory context. The majority focuses intently on the word "notice," and it insists that there are instances in everyday parlance in which that term is used to refer to a message "given from one individual or entity to another"-such as, for example, when a utility company issues a "notice" to a customer that her power is about to be cut or an employee gives his boss "notice" that he won't be at work. Maj. Op. at 932-34. Thus, the majority concludes, a "notice" needn't necessarily be "sent to the general public or at least a group of people." Maj. Op. at 933. Fair enough-a "notice" can be sent from one individual to another; some uses of the word entail public dissemination, others don't.[3] The question for us, though, isn't whether in the abstract the word "notice" might possibly be understood to encompass person-to-person communications. Rather, and more specifically, the question is whether the word "notice" as used in § 2251(d)(1) -and as informed by the statutory context-would ordinarily be understood by the average speaker of American English to cover a private text message sent from one individual to another. See, e.g. , Tyler v. Cain , 533 U.S. 656, 662, 121 S.Ct. 2478, 150 L.Ed.2d 632 (2001) (emphasizing that courts should not "construe the meaning of statutory terms in a vacuum"); Deal v. United States , 508 U.S. 129, 132, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993) (observing that the meaning of a statutory term should not be "determined in isolation," but instead "must be drawn from the context in which it is used").
Here, therefore, the fact that the term "notice" can be understood to describe one-to-one communications does not mean that it is best understood that way in § 2251(d)(1). Context is critical-here, as elsewhere, it "disambiguates." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 70 (Thompson/West 2012). Accordingly, we must consider the term "notice" not in splendid isolation, but rather-on the principle that a "word is given more precise content by the neighboring words with which it is associated," United States v. Williams , 553 U.S. 285, 294, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008) -as part of an integrated statutory provision that prescribes a stiff punishment for anyone who "makes, prints, or publishes ... any notice or advertisement." 18 U.S.C. § 2251(d)(1)(A). As explained below, once *943 we interpret "notice" by reference to its "neighbor[s]," it becomes clear-to me, anyway-that § 2251(d)(1) does not extend to private, person-to-person text messages.
1
Let's start with the verbs. Under § 2251(d)(1), it's not enough that a "notice" exist-it must have been "ma[de], print[ed], or publishe[d]." As already noted, the majority doesn't suggest that, when one sends a text message he "prints" or "publishes" anything. Rather, the majority focuses on the term "make[ ]," which it presumably concludes needn't necessarily entail any public dissemination. Maj. Op. at 932. And standing alone (again, as with "notice," in the abstract), the word "make[ ]" can be understood that way-as in, to "make" an offer or request. See Oxford Dictionary of English 1069 (3d ed. 2010) (defining "make" to include to "communicate or express (an idea, request, or requirement)," as in "make him an offer he can't refuse"). In concluding that Caniff "made 'notices' that he desired to receive child pornography," Maj. Op. at 937, the majority essentially reads "make[ ]" a "notice" to mean "make[ ] a request."
But the context in which "make[ ]" is used in § 2251(d)(1) undercuts the majority's interpretation, because the word "make[ ]" has to be understood in the light of its statutory companions, "print[ ]" and "publish[ ]." Let's start with "publish." That the term contemplates a public communication is evident from its Latin root-"publicare." Webster's Second New International Dictionary 2005 (1944). True to those roots, Webster's Second defines "publish" to mean "[t]o make public announcement of" or "to make known to people in general"-or, alternatively, "[t]o bring before the public, as for sale or distribution." Id . Webster's Third similarly defines the term to mean "to declare publicly" or to "make generally known"-or, alternatively, "to call to the attention of the public: advertise," "to place before the public (as through a mass medium)," or to "disseminate." Webster's Third New International Dictionary 1387 (2002). See also Oxford English Dictionary (3d ed. 2011), http://www.oed.com (Feb. 12, 2019) ("[t]o make public or generally known; to declare or report openly or publicly; to announce; (also) to propagate or disseminate"-or, alternatively, "to prepare and issue copies of (a book, newspaper, piece of music, etc.) for distribution or sale to the public").
"Print" is similar. The most pertinent definition in Webster's Second defines "print" to mean "[t]o publish a book, article, music, or the like," Webster's Second at 1967, and the successor in Webster's Third treats the term as a subset of publishing generally, defining it to include "to publish in print"-as in "all the news that's fit to print," Webster's Third at 1803. The OED likewise (as relevant here) defines "print" as meaning "[t]o cause (a manuscript, book, etc.) to be printed," "to give to the press," or "to publish." Oxford English .
What, then, of "make[ ]"? The definitions of "print" and "publish" indicate, to my mind, that the word "make[ ]," as used in § 2251(d)(1), is not meant in the make-a-request sense. When one says that something has been "print[ed]" or "publishe[d]," it's quite unlikely that she has in mind an audience of one. Rather, both "print[ ]" and "publish[ ]" overwhelmingly involve the announcement of a message to the public. At least as it pertains to "notice or advertisement"-more on that phrase in a moment-"make[ ]" fits comfortably within that ambit. The public-ness of the terms "print[ ]" and "publish[ ]" indicates that when one "makes" a "notice or advertisement," he is likewise doing so for broad dissemination-or at least dissemination *944 beyond a single individual. One could "make[ ]" a "notice or advertisement" in a TV commercial or on a blog. But at least in the context of § 2251(d)(1), one does not "make[ ]" a "notice" in a private, person-to-person text message.
2
But there's more-a second bit of context that informs the analysis here. "[N]otice" is part of a linguistic package-"notice or advertisement." What can we learn about the meaning of "notice"-again, as used in § 2251(d)(1) -from its statutory running buddy, "advertisement"?[4] Standard English-language dictionaries confirm what we all know to be true-that, at least as used in modern parlance, an "advertisement" typically entails a public statement. Webster's Second , for instance, defines "advertisement" (in the only entry not marked either "obs[olete]" or "arch[aic]") to mean "[a] public notice, esp. in some public print, as a newspaper, periodical, book, poster, or handbill ...." Webster's Second at 39 (1944). Webster's Third echoes that definition, adding only that an advertisement is typically "paid" and may also be disseminated "over radio or television." Webster's Third at 31 (2002). The OED likewise defines "advertisement" (in its non-obsolete, non-archaic sense) to mean "a public notice or announcement, now esp. one advertising goods or services"-originally "on a placard, poster, etc., or in a journal or newspaper," and more recently "on a broadcast medium [such] as radio, television, etc." Oxford English . In Black's , more of the same: "a commercial solicitation"-"an item of published or transmitted matter made with the intention of attracting clients or customers." Black's Law Dictionary at 65 (10th ed. 2009).
On balance, I think that the placement of the term "notice" alongside the term "advertisement" indicates that, at least as used in § 2251(d)(1), the former, like the latter, ordinarily contemplates a public communication. The dictionaries are chock full of definitions of "notice" that closely resemble those of "advertisement." One usage of "notice," for instance, according to Webster's Second , is "[a] written or printed sign ... communicating information or warning"-as in "to put a notice on a door." Webster's Second at 1669. So too in Webster's Third : "a written or printed announcement or bulletin''-like "insert[ing] a notice in the newspaper." Webster's Third at 1544. And the OED : "a displayed sign or placard giving news or information" (such as, for example, "notices on the bulletin board at your grocery store, describing your product and giving a price") or "[a] short announcement or advertisement in a newspaper, magazine, etc." Oxford English . And Black's , as well:
*945 "[a] written or printed announcement"-as in "the notice of sale was posted on the courthouse bulletin boards." Black's Law Dictionary at 1227. Cf. also Gustafson v. Alloyd Co. , 513 U.S. 561, 575-76, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) (interpreting the phrase "any communication" to refer only to public communications, in part because the adjacent inclusion of the terms "notice , circular, [and] advertisement " made it "apparent that the list refer[red] to documents of wide dissemination " (emphasis added) ).[5]
A common theme unites these definitions of the statutorily connected terms "notice" and "advertisement": a communication that is usually commercial in nature and usually conveyed via public medium-sign, poster, placard, bulletin board, newspaper, radio, television, etc. Where do text messages fit? I don't think they do. To the chagrin of many-and perhaps especially many parents of teenagers [said the parent of teenagers]-text messages have largely replaced face-to-face communications and telephone conversations. They are not, though, the modern-day analogues of the public-facing media so pervasively referenced in the definitions of "notice" and "advertisement." (It is worth noting in this connection-even if only briefly-that under the majority's broad interpretation, a person also "make[s]" a "notice" within the meaning of § 2251(d)(1) when she places a telephone call. That seems strange to me, but it follows inexorably from the majority's logic.)
To be clear, saying that, as used in § 2251(d)(1), a "notice" entails some public dissemination does not require that it be blasted to the public at large. Other circuits have held, for instance-I think correctly-that § 2251(d)(1) makes it a crime to post offers to buy and sell child pornography in computer "chat rooms." See, e.g. , United States v. Grovo , 826 F.3d 1207, 1211 (9th Cir. 2016) (message visible to 40-45 people); United States v. Franklin , 785 F.3d 1365, 1367 (10th Cir. 2015) (message visible to 108 people). Posts in chat rooms or to online message boards are just the contemporary (and nefarious) successors to the signs, posters, and placards to which pre-internet dictionaries refer. That an online message board might be password-protected doesn't make the "notice[s] or advertisement[s]" posted there any less public-it's the equivalent of a bulletin board in a college dorm that requires keycard access to enter.
In any event, I conclude that, on balance, the juxtaposition of the words "notice" and "advertisement"-particularly following, as they do, the verbs "make[ ]," "print[ ]," and "publish[ ]"-favors an understanding of "notice" that entails dissemination to more than a single individual.[6]
* * *
*946 The unfortunate bottom line for me is this: No ordinary speaker of American English would describe a private, person-to-person text message-whether requesting milk from the grocery or, far more disgustingly, pornographic images from a teenager-as the "mak[ing]" of a "notice." And the context in which those terms are used in § 2251(d)(1) -surrounded as they are by words like "print[ ]," "publish[ ]," and "advertisement"-confirms that the proscription on "mak[ing]" a "notice" doesn't reach Caniff's conduct.[7]
II
At bottom, the majority's interpretation of § 2251(d)(1) isn't textual-it's purposive. See, e.g. , Maj. Op. at 936 (relying on out-of-circuit district court opinions asserting Congress's "clear statutory purpose" and "primary intent") (quoting United States v. Peterson , No. CR 12-228-GW, 2015 WL 13657215, at *5 (C.D. Cal. Mar. 20, 2015) (unreported), and United States v. Christie , 570 F.Supp.2d 657, 665 (D. N.J. 2008) ). To be clear, I'm fully on board with the objective of "eradicat[ing] the child-pornography market," id .-and again, Congress seems to have done a good job of enacting a cluster of statutes that substantially advance that objective. But even in the service of such a noble purpose, we can't make one of the statutes within that cluster- § 2251(d)(1) -say *947 what it doesn't say. Section 2251(d)(1) 's ordinary meaning should inform what we take to be Congress's purpose, not the other way around. See United States v. Wiltberger , 18 U.S. (5 Wheat.) 76, 96, 5 L.Ed. 37 (1820) (Marshall, C.J.) (stating that "[t]he intention of the legislature is to be collected from the words they employ" and elaborating that "[t]o determine that a case is within the intention of a statute, its language must authorise us to say so").
The majority is chiefly concerned that interpreting § 2251(d)(1) in accordance with (what I think to be) its ordinary meaning would create a "loophole" in the child-pornography laws that "would leave the most vulnerable of the victims of pedophilia unprotected against the most effective and hardest to detect predatory conduct." Maj. Op. at 936. Fortunately, that's not true. Regardless of what we say today about § 2251(d)(1) 's reach, Title 18 includes an entire chapter dedicated to punishing the "Sexual Exploitation and Other Abuses of Children." The provisions included in that chapter pretty well cover the waterfront, and they give the government ample ammunition to get at the peddlers and consumers of child porn-including those, like Caniff, who solicit their smut through private text messages.
Perhaps most clearly, 18 U.S.C. § 2251(a) prescribes a 15-years-to-life sentence for anyone "who employs, uses, persuades, induces, entices, or coerces any minor to engage in ... any sexually explicit conduct for the purpose of producing any visual depiction of such conduct." That prohibition extends not only to those who solicit minors for sex, but also to those, like Caniff, who ask for nude photos-the surest proof being that Caniff was charged and convicted under § 2251(a), and we have affirmed that conviction today. See also, e.g ., United States v. Mathis , 767 F.3d 1264, 1279 (11th Cir. 2014) (rejecting a sufficiency-of-the-evidence challenge to a § 2251(a) conviction of a defendant who sent a text message to a minor "offer[ing] to pay [the minor] for a picture of [her] genitalia" and "direct[ing the minor] to take sexually explicit pictures").
Then there's 18 U.S.C. § 2252(a)(2), which makes it a crime-punishable by five to 40 years in prison-to "knowingly receive[ ] ... any visual depiction" of a minor engaging in "sexually explicit conduct" by "using any means or facility of interstate or foreign ... mails." So too § 2252A, which makes it a crime-also punishable by five to 40 years-to knowingly receive "any child pornography that has been mailed ... using any means or facility of interstate or foreign commerce ... by any means, including by computer." Notably, wholly apart from the act of soliciting nude photos, § 2252(a)(2) and § 2252A allow the government to separately charge an individual if he receives pictures via "any means or facility of interstate or foreign commerce." Thus, it seems to me, there is essentially zero risk that an ordinary-meaning interpretation of § 2251(d)(1) would (as the government warns) allow individuals like Caniff to "circumvent federal law merely because child pornography is noticed or advertised to an individual via text message." Br. of Appellee at 39.
In short, Caniff's conduct is covered; Congress's intent has been well served. We needn't, and shouldn't-either in the name of statutory "purpose" or otherwise-graft onto § 2251(d)(1) a strained, acontextual interpretation.
III
There's a big piece of me that thinks that because Caniff (even more so than Master Rich) is "bad," he should have the book-for that matter, the whole library-thrown at him. The law, though, is a pesky *948 thing. Caniff, while guilty of many crimes-some charged, some not-is not guilty of "mak[ing], print[ing], or publish[ing]" an "advertisement or notice" for child pornography within the meaning of 18 U.S.C. § 2251(d)(1). Accordingly, while I join Parts I, II.B., and II.C of the majority opinion, I must respectfully dissent from Part II.A.

A Man for All Seasons (Columbia Pictures 1966). For this clip in particular, see A Man for All Seasons-The Devil and The Law , YouTube (Sept. 30, 2011), https://www.youtube.com/watch?v=d9rjGTOA2NA.

Before jumping into the merits, I should briefly clear away a bit of procedural underbrush. As the majority notes, Caniff didn't request a jury instruction specifically defining "notice," Maj. Op. at 932-33, and he hasn't argued on appeal "that the district court made any legal error in submitting this term to the jury for its determination." Id. at 937. To be clear, I don't take issue with the jury instructions here-which, as is commonplace, just tracked the language of § 2251(d)(1). See United States v. Pabon-Cruz , 391 F.3d 86, 96 (2d Cir. 2004) (declining, in a § 2251(d)(1) case, to hold that the district court plainly erred by "strict[ly] adher[ing] to the text of the statute in framing [its] jury instruction"). That said, we must still determine whether Caniff's conviction can be squared with the statute's language. See, e.g ., Smith v. United States , 508 U.S. 223, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993) (considering, even in the absence of a clarifying jury instruction, whether the defendant was properly convicted under 18 U.S.C. § 924(c)(1), which criminalizes the "use of a firearm during and in relation to ... [a] drug trafficking crime").

Compare, e.g. , Black's Law Dictionary 1227 (10th ed. 2014) (a "[l]egal notification required by law or agreement," such as a tenant giving a landlord "written notice" before vacating an apartment), with , e.g. , Webster's Third New International Dictionary 1544 (2002) ("a written or printed announcement or bulletin"-as in "inserted a notice in the newspaper").

With respect to the phrase "notice or advertisement," the majority objects that the noscitur a sociis canon-the principle that a word is known by the company it keeps-"is not particularly helpful here to define one of two statutory terms." Maj. Op. at 935 n.4. The canons, though, aren't hard and fast rules, so we shouldn't set an artificial floor on the number of words required for an apt comparison. See MBIA Ins. Corp. v. F.D.I.C. , 708 F.3d 234, 241, 245 (D.C. Cir. 2013) (declining to accept a party's argument that "a list of two words is an inappropriate occasion for application of noscitur a sociis "); Scalia & Garner, supra , at 197 (stating that "[a]lthough most associated-words cases involve listings ... a listing is not [a] prerequisite" because an "association is all that is required"). Graham County Soil & Water Conservation District v. United States , which the majority cites, does not suggest otherwise; unlike the closely related terms "notice" and "advertisement," the Court explained there that the "list of three terms [at issue were] quite distinct from the other[s] no matter how construed." 559 U.S. 280, 288, 130 S.Ct. 1396, 176 L.Ed.2d 225 (2010).

I'm mindful, of course, "that identical language may convey varying content when used in different statutes." Yates v. United States , --- U.S. ----, 135 S.Ct. 1074, 1082, 191 L.Ed.2d 64 (2015). But for what it's worth, other statutes-like the one at issue in Gustafson -use language like that found in § 2251(d)(1) in contexts that one would (I think) tend to associate with wide dissemination. Title VII, for instance, makes it unlawful-in the context of job postings-"to print or publish ... any notice or advertisement relating to employment" that includes discriminatory preferences. 42 U.S.C. § 2000e-3 (emphasis added). The Fair Housing Act does the same for those who publicize the availability of housing, making it unlawful to "make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement " indicative of such preferences "with respect to the sale or rental of a dwelling." 42 U.S.C. § 3604(c) (emphasis added).

There are two loose ends concerning the phrase "notice or advertisement." First, the majority takes great pains to emphasize that the phrase is preceded by the word "any." Maj. Op. at 934-35. It's true, of course, that "any" is a capacious term-we've said so repeatedly. But it's equally true that the net cast by the term "any" is necessarily limited by a proper understanding of the nouns that it modifies. Introduction of that one word provides no basis for grafting onto the phrase "notice or advertisement" a construction that neither ordinary meaning nor statutory context sensibly supports. Moreover, if the word "any" bore the weight that the majority assigns to it-such that it ropes in every communication, public and private alike-one is left to wonder why Congress would have drafted so elliptically. Why not just use the more economical "any communication"?
Second, and separately, given the usual rule that we are "obliged to give effect, if possible, to every word Congress used," Reiter v. Sonotone Corp. , 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979), what distinguishes a "notice" from an "advertisement?" Well, plenty of things: an advertisement typically embodies a commercial message in a way that a notice need not; an advertisement is usually designed to induce its recipient to respond in a way that a notice isn't necessarily. In any event, even if, as to public-ness, there isn't much daylight between the two terms as I understand them, I wouldn't give § 2251(d)(1) a meaning that the text doesn't comfortably support based on a desire, however well-intentioned, to avoid surplusage. "Doublets and triplets abound in legalese," especially given that Congress more than occasionally brings a "belt-and-suspenders" mentality to drafting statutes. See Scalia & Garner, supra , at 176-77 (cautioning that the surplusage canon must be applied "with careful regard to context" and that "a court may well prefer ordinary meaning to an unusual meaning that will avoid surplusage").

Although by no means necessary to my conclusion, I'm tempted to pile on by invoking the rule of lenity-which states, in essence, that if at the end of the interpretive road, having applied the applicable semantic and contextual canons of interpretation, there exists any meaningful doubt about the application of a criminal statute to a defendant's conduct, then the doubt should be resolved in the defendant's favor. See Scalia & Garner, supra , at 296-302. Caniff, though, hasn't invoked the rule in support of his contention that § 2251(d)(1) doesn't reach his conduct, and this Court seems to have held-oddly to my mind-that a criminal defendant can waive a lenity-based argument by failing to affirmatively assert it. See United States v. Thompson , 702 F.3d 604, 608 n.1 (11th Cir. 2012). I tend to think of the rule of lenity, like any other interpretive canon, not as a litigating position of the sort that might be waived or abandoned, but rather as an in-the-nature-of-things clue to the meaning of a statutory enactment-a clue that a court could, and even should, invoke on its own if necessary to a proper interpretation. But that's an issue for another day.